**In re Gregory D. & Lisa M. SULLIVAN, Debtors.**

**Bankruptcy No. 95–53271–K.**

United States Bankruptcy Court, W.D. Texas, San Antonio Division.

March 20, 1996.

Roger N. Havekost, San Antonio, Texas, for Debtors.

Marion A. Olson Jr., Chapter 13 Trustee, San Antonio, Texas.

### DECISION ON CONFIRMATION OF DEBTORS' PLAN

LEIF M. CLARK, Bankruptcy Judge.

This case involves the ability of debtors to separately classify student loans in their chapter 13 plans. The issue has bedeviled many courts for some years now, including this court. Despite the plethora of decisions already written in this area, the court is constrained to add to the literature, in order to advise trustees, debtors, and creditors of the position to be taken by this court in future cases.

### Background

Gregory and Lisa Sullivan had incurred student loan liabilities. Gregory had debts arising from his student days at Texas Tech University, though he never obtained a degree. His current job is unrelated to his education. Lisa has a "Co–Step" loan from her undergraduate days, and a "Sally Mae" loan relating to her nursing school training. She is currently a registered nurse. In their chapter 13 plan, the debtors propose to place their student loans into a separate class. Full payment of the student loans results in a dividend of approximately 3% to other unsecured creditors. If the student loans are not separately classified, the overall payout to unsecured creditors would rise to 30%.

The Trustee declined to recommend confirmation of the debtors' plan, believing that the separate classification of the student loans proposed would result in unfair discrimination, in contravention of the proscription found in section 1322(b)(1). *See* 11 U.S.C. § 1322(b)(1). The debtors countered that separate classification was a practical necessity, because student loans are nondischargeable now, thanks to amendments made to section 1328 by the Omnibus Budget Reconciliation Act of 1990, Pub L 101–508. *See* 11 U.S.C. § 1328(a)(2). Unless they can pay off these debts in full during the term of the plan, the debtors say that their fresh start will be jeopardized, not only by virtue of the sheer amount of student loan liability which will remain to be paid, but also (and perhaps more seriously) by virtue of the interest that will have accrued on the student loans during the pendency of the case.

The debtors explain that they cannot pay this interest on a current basis during the course of the case because such payments could only come out of net disposable income which must, by statute, be devoted to the plan payments. *See* 11 U.S.C. § 1325(b).[1]

---

1. All of the debtor's net disposable income must be used to make plan payments in any case in

The debtors know that they will not be able to afford to pay the huge liability which will have accrued on their student loans if this interest cannot be kept current, but they also realize that the accruing interest cannot be paid under the plan, because section 502(b)(2) expressly disallows any claim for interest accruing on unsecured claims during the pendency of the bankruptcy case as a claim against the estate. *See* 11 U.S.C. § 502(b)(2) (disallowing claims for unmatured interest).

Faced with these economic realities, the debtors argue that separate classification is essential for any kind of fresh start. The rather unpalatable alternative the debtors offer to the court is a plan which does not separately classify the student loans, followed by a new bankruptcy filing to deal with the remaining student loan liability, by then expected to be swelled by some three to five years of accrued interest liability.[2] The debtors plead for the court to fashion some equitable escape from this collection of statutory roadblocks to achieving the fresh start which Chapter 13 was supposed to afford.

The dispositive issues the court must analyze on the road to finding an equitable escape are: 1) whether post-petition interest on nondischargeable student loans continues to accrue against the individual debtor during the pendency of Chapter 13 proceedings; 2) whether a Chapter 13 plan which proposes to separately classify and fully repay nondischargeable student loans unfairly discriminates against other unsecured creditors; and 3) whether any alternative is available under chapter 13.

## I. POST–PETITION ACCRUAL OF INTEREST

The leading case on the issue of whether post-petition interest continues to accrue against the debtor is *Leeper v. PHEAA*, 49 F.3d 98 (3d Cir.1995). In an appeal that presented "an issue of first impression for the courts of appeal ...," the Third Circuit held that nondischargeable claims, as against the debtor, continue to accrue interest during the pendency of a chapter 13 bankruptcy case. *Id.*, at 105. The Third Circuit based its holding on the Supreme Court's decision in *Bruning v. United States*, 376 U.S. 358, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964).

In *Bruning*, a pre-Code case, a taxpayer challenged the Internal Revenue Service's collection of post-petition interest on a nondischargeable tax debt after the conclusion of Bruning's bankruptcy. The taxpayer based his challenge upon the traditional rule (now codified at 11 U.S.C. § 502(b)(2)) barring creditors from claiming post-petition interest against a bankruptcy estate.[3] In a unanimous decision, the Supreme Court rejected the taxpayer's argument and held that although unmatured interest is uncollectible against the estate, the interest, like the underlying tax debt, is nondischargeable and may be collected from the taxpayer after the conclusion of his bankruptcy. *Id.*

The Court reasoned that, because Congress made the tax debt nondischargeable, it "clearly intended that personal liability for unpaid tax debts survive bankruptcy." *Id.* at 361, 84 S.Ct. at 908. The Court further observed that interest is an integral part of the underlying and continuing debt because interest represents the cost for using a creditor's funds and is an incentive for prompt repayment. *Id.* at 360, 84 S.Ct. at 907–08. The Court found no "reason to believe that Congress had a different intention with re-

which the trustee objects to confirmation. Net disposable income is all post-petition income net of monies reasonably necessary for the maintenance or support of the debtor and the debtor's dependents. Interest payments on student loans are not payments made for the maintenance or support of the debtor or the debtor's dependents. Thus, monies devoted to make such payments are in fact part of the debtor's net disposable income.

2. Actually, even a separate classification of the student loans fails to achieve the result the debt-

ors desire, because interest will still accrue on the debt. Thus, at the close of the case, the debtors might still be presented with a claim by the student loan creditors for the "unmatured interest" that could not be paid by the estate (because of section 502(b)(2)) but which nonetheless accrued on the debt. *See* discussion *infra*.

3. 11 U.S.C. § 502(b)(2) provides that a court shall not allow a claim to the extent the claim is for unmatured interest.

gard to personal liability for the interest on such debts." *Id.* at 361, 84 S.Ct. at 908. Thus, if a tax debt is nondischargeable, then the post-petition interest on the tax debt is also nondischargeable. *Id.*

The Third Circuit in *Leeper* concluded that *Bruning* stood for the "general proposition that creditors may accrue as to the debtor personally, post-petition interest on nondischargeable debts while a bankruptcy is pending."[4] The debtors in *Leeper* argued that it would be unfair to apply *Bruning* in the Chapter 13 context, however, because a Chapter 13 plan cannot make provisions for the payment of post-petition interest accruing on a nondischargeable debt. The Third Circuit did not find the distinction compelling. *Leeper,* 49 F.3d at 102. The court noted that in "all situations where the *Bruning* rule is applicable, the bankruptcy plan cannot make allowances for post-petition interest; the interest merely accrues and is collectible against the debtor after the bankruptcy is completed. Thus, the debtors' effort to distinguish Chapter 13 cases on this ground is unpersuasive." *Id.*[5]

We need not rely solely on the *Bruning* (a pre-code case) analysis to reach the same conclusion as did the Third Circuit in *Leeper.* The amendments to the Code themselves mandate a finding that interest continues to accrue, and in the case of nondischargeable debts, is collectible post-bankruptcy from the debtor personally. Section 502(b)(2) states

that any claim for post-petition interest will not be *allowed* against a bankruptcy estate. Disallowance is not the same as non-accrual. True enough, when a debt is dischargeable, it makes no difference whether a creditor continues to accrue interest against the debtor, because the discharge itself will prevent the creditor from collecting the interest from the debtor. The accrued interest is also uncollectible against the estate by virtue of § 502(b)(2), and the creditor is stayed from recovering the accruing interest from the debtor during the pendency of the case prior to discharge because of the automatic stay.[6]

The scenario changes however, when the debt is nondischargeable (such as are student loans). Nothing in the Code acts to suspend the *accrual* of interest. The Code merely prevents post-petition interest from being collected from the estate (ever) or from the debtor (during the pendency of the bankruptcy). Therefore, after the bankruptcy (and the lifting of the stay) there is nothing to prevent a creditor from seeking to collect the interest which has accrued on a debt that was not discharged.[7]

The sole (and universally criticized) case to hold otherwise is *In re Wasson,* 152 B.R. 639 (Bankr.D.N.M.1993). The *Wasson* court held that "the Bankruptcy Code does not allow a creditor's claim for post-petition interest on a nondischargeable student loan when the underlying claim is paid in full from

---

4. Although *Bruning* was a pre-code case it has been applied by other circuit courts to cases arising under the code. *See e.g. In re Burns,* 887 F.2d 1541 (11th Cir.1989) (specifically finding that the *Bruning* holding survived the code's enactment); *In re Hanna,* 872 F.2d 829, 830–31 (8th Cir.1989) (same). Additionally, the *Bruning* holding has been applied to other nondischargeable types of debts. *See, e.g. In re Brace,* 131 B.R. 612, 613–14 (Bankr.W.D.Mich.1991) (interest accrued on debt that was nondischargeable pursuant to 11 U.S.C. § 523(a)(2)); *In re Kellar,* 125 B.R. 716, 720–21 (Bankr.N.D.N.Y.1989) (same).

5. The accrual of post-petition interest in a chapter 13 case actually *is* different and has a greater impact on the debtor than interest accrual in a chapter 7 or 11 case. The length of time interest accrues during a Chapter 13 is much longer, as is the deferral of the discharge (five years is not an uncommon term in this district). That is a

much greater burden than the amount of interest which will accrue during the term of a typical chapter 7 liquidation. Even chapter 11 cases (at least those involving individuals) tend to have a shorter time horizon (usually one year to eighteen months from filing to confirmation and discharge). Additionally, a reorganized corporate debtor after a successful chapter 11 plan will, in most cases, be better equipped to deal with a nondischargeable post-petition interest expense than will an individual chapter 13 debtor. Whether the distinction is one that has legal significance is quite another question, however.

6. *But see, In re El Paso Refining, Inc.,* 192 B.R. 144, 145–46 (Bankr.W.D.Tex.1996) (post-petition interest is collectible in some cases against the debtor's guarantor).

7. *See Bruning, supra,* (interest represents a use cost and is part of the underlying claim).

the bankruptcy estate." *Id.* at 642. It would seem that the *Wasson* court has "confused the disallowance of unmatured interest with the non-accrual of interest." *Leeper,* 49 F.3d at 102. The *Wasson* court found that, because the creditor's claim was "paid in full" by the estate, the individual debtor was not liable for post-petition interest. The error in this reasoning is that the creditor's claim was in fact *not* "paid in full" by the estate. Section 502(b)(2) had disallowed the creditor's claim for post-petition interest. By definition, that portion of the claim was not paid by the estate, and so remained unsatisfied. *Wasson*'s conclusion cannot be squared with the statute and thus must be rejected.

Post-petition interest *does* accrue on a claim, whether the claim is discharged or not. Post-petition interest cannot be allowed as a claim against the estate, and cannot be collected against the debtor if the underlying claim is discharged. If the claim is *not* discharged, however, the creditor will be able to pursue collection of the claim (including the interest that has been accruing on that claim) against the debtor once the bankruptcy stay is terminated. If the claim is nondischargeable, so also is the interest that continues to accrue on that claim.

## II.  SEPARATE CLASSIFICATION

Separate classification of student loan indebtedness has been the subject of quite a number of bankruptcy opinions since 11 U.S.C. § 523(a)(8) was enacted in 1990. It is possible to find case law support for just about any proposition, ranging from the allowance of a separate class providing for the 100% payment of student loans while general unsecureds receive practically nothing,[8] to the disallowance of any plan that proposes to treat student loan creditors substantially different than other unsecured creditors.[9]

Although courts may reach different conclusions, the cases break down along three general approaches to the problem: (1) cases which determine whether the separate classification unfairly discriminates against other unsecured creditors under 11 U.S.C. § 1322(b); (2) cases which allow debtors to treat student loan indebtedness differently after 36 months under 11 U.S.C. § 1325(b); and (3) cases which allow treatment of student loan indebtedness under the long term debt provision of 11 U.S.C. § 1322(b)(5).

### § 1322(b) Discrimination

A Chapter 13 plan may, "designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated ..." 11 U.S.C. § 1322(b)(1). The phrase "discriminate unfairly" is not defined in the Code and courts differ greatly over whether a given classification scheme discriminates unfairly.

The Eighth Circuit, in *In re Leser,* 939 F.2d 669, 672 (8th Cir.1991), set up a four-part test to determine whether a plan discriminates unfairly: 1) whether the discrimination has a reasonable basis; 2) whether the debtor can carry out a plan without the discrimination; 3) whether the discrimination is proposed in good faith; and 4) whether the degree of discrimination is directly related to the basis or rationale for the discrimination. However, the *Leser* test is by no means universally accepted or adopted. In fact, even the Eighth Circuit does not require specific findings on each of *Leser's* four elements. *See In re Groves,* 39 F.3d 212, 214 (8th Cir.1994) (application of the discriminate unfairly standard "may involve little more than exercise of the bankruptcy court's broad discretion");[10] *see also In re Willis,* 189 B.R. 203, 205 (Bankr.N.D.Okla.1995) ("discrimina-

---

**8.** *See, e.g., In re Willis,* 189 B.R. 203, 205 (Bankr. N.D.Okla.1995) (plan did not discriminate unfairly which paid 100% of student loan debts, while paying only 10% of other unsecured nonpriority debt).

**9.** *See, e.g., In re Groves,* 39 F.3d 212, 215 (8th Cir.1994) (unless absolutely necessary for plan completion, separate classification of student loan and general unsecured obligations cannot be permitted under the Bankruptcy Code.)

**10.** It should be noted that even in *Leser* the Eighth Circuit recognized that the bankruptcy court did not explicitly apply each part of the test to determine that the Leser's Chapter 13 plan did not unfairly discriminate.... Nevertheless, the circuit court was satisfied that [the bankruptcy court's] conclusion based on its implicit findings [was] correct. *Leser,* 939 F.2d at 672.

tion is 'fair,' and therefore permissible, to the extent, and only to the extent, that it rationally furthers an articulated, legitimate interest of the debtor"). Even though some courts refer to the *"Leser* test" for unfair discrimination, its prongs should not be mechanically applied. At best, it is a useful guide which highlights some of the important factors a court should weigh when deciding whether a plan unfairly discriminates.

Courts that hold that separate classification is not unfair discrimination generally justify their result in the following ways. Some courts find that, by operation of section 1122(a), student loan claims are not substantially similar to the claims of other general unsecured claims and so must be separately classified. These courts reason that the nondischargeable nature of student loans and the fact that student loans usually entail periodic payments over an extended time require a finding that student loan claims are not substantially similar to other general unsecured claims. *See e.g., In re Rudy,* 1995 WL 365370 (Bankr.S.D.Ohio 1993) (*en banc* decision by William A. Clark, Chief Bankruptcy Judge and Thomas F. Waldron, Bankruptcy Judge); *In re Willis,* 189 B.R. 203, 205 (Bankr.N.D.Okla.1995).

However, determining that the claims are not similar only justifies placing student loans in a separate class, a proposition for which no justification was needed. Section 1122(a), the statutory standard incorporated by reference into the classification rule for chapter 13 plans set out in section 1322(b)(1), only proscribes placing dissimilar claims in the same class. There is no requirement that similar claims *must* be placed in the same class. Thus, even if student loan creditors are similar to other creditors, a debtor is still free to place them in a separate class. The appropriate question to ask is whether there is something about student loan indebtedness that justifies not just separate classification but *disparate treatment.*

There are two main arguments normally advanced to justify unequal treatment favoring student loans. Some emphasize the debtor's interest in receiving a "fresh start," while others rely on a public policy argument that student loans need to be favored to encourage the continuation of student loan programs, which afford educational opportunity to a broader economic spectrum.

■ The court in *In re Willis* laid out the "fresh start" argument thusly:

... Debtor's discrimination is reasonable so that she may pay her nondischargeable student loan debts within the Plan. If the Debtor emerges from bankruptcy still owing her student loans, she will not have the benefit of the "fresh start" ...

... A Debtor's interest in receiving a "fresh start" is also a reasonable basis for discrimination. Congress has called the "fresh start," the essence of modern bankruptcy law. The fresh start has been recognized by courts as one of the primary purposes of bankruptcy law. Debtor should be allowed to complete her Chapter 13 Plan and emerge from bankruptcy without the burden of her nondischargeable student loans.

*Willis,* 189 B.R. at 205.

It is undisputed that one of the "primary purposes of bankruptcy law" is to give debtors a fresh start. But the "fresh start" is coterminous with the discharge. By making a given debt nondischargeable, Congress has elevated the need to repay such a debt over the debtor's interest in a fresh start. The debtor is not expected to obtain an unfettered "fresh start" *vis-a-vis* nondischargeable obligations. No one would seriously argue that a debtor's interest in a fresh start would justify discrimination in favor of a debt incurred through fraud just because the debt happens also to be nondischargeable under section 523(a)(2). Yet that is the essence of the argument made in *Willis*—that the nondischargeable nature of the debt fetters the debtor's fresh start, justifying disparate treatment in favor of the nondischargeable debt. The argument misapprehends the intended scope of the fresh start, and must be rejected.

Secondly, some courts have tried to justify disparate treatment premised on the public's interest in preserving and fostering student loan programs. Just as discrimination in favor of support obligations for dependent children and spouses has been upheld, courts

maintain that prompt and complete repayment of student loans in bankruptcy helps to assure that innocent potential recipients of student loans will not be threatened by burgeoning defaults and nonpayment leading to constrictions in student loan programs. In *Willis* the court observed that

> ... In addition, by providing that student loans are not dischargeable in bankruptcy except in very limited circumstances, Congress has established a public policy in favor of repayment of student loan debts. The repayment of student loans allows the perpetuation of the process whereby persons who would not otherwise have the opportunity may be afforded an education. Although the other unsecured creditors are denied an additional percentage of the money which Debtor will contribute to the Plan, Debtor's interest in paying the nondischargeable student loans outweighs the creditor's interest in receiving the additional funds.

*Id.*[11]

Accepting the general proposition that repayment of student loans further an important public policy (indeed, that is one of the principal justifications for making such loans nondischargeable), the real question is whether student loan creditors should be afforded a *de facto* priority over other unsecured creditors by means of disparate plan treatment that favors their repayment. The simplest way for Congress to have expressed its support for such a policy would have been for it to have created a priority for such claims in section 507. The fact that it did not is at least some evidence that priority of repayment for student loans was not the intent of Congress, and that section 1322 should therefore not be interpreted so as to accord such a priority.

One court has opined that the "federal government's need for repayment of student loans, while an important policy objective, does not approach a family's need for the *immediate* payment of alimony or child support obligations." *In re Cox*, 186 B.R. 744, 746 (Bankr.N.D.Fla.1995) (emphasis added). The impact of nonpayment on student loan programs, while deleterious, is not nearly so immediate as is the impact of nonpayment to a family relying on regular child support payments to pay the rent and buy the groceries. The aggregation of interest accrual and the collection remedies available to student loan programs afford significant protections to student loan creditors which, when coupled with the provisions for nondischargeability enacted by Congress in 1990, may be said to adequately address the public's legitimate concern that bankruptcy not be employed to exacerbate the default rate in student loan programs. For children and spouses dependent upon support obligations in order to live, mere nondischargeability and interest accrual are inadequate responses to the problem of nonpayment. Having a claim for child support that survives discharge and accrues interest—but which will not be repaid until three to five years after the debtor's bankruptcy filing—will not feed the children today. Add to that the reality that most spouses lack the resources to pursue recovery of their support claims, resources which are available to most student loan creditors, and it is easy to see that the analogy between student loan obligations and spousal support obligations quickly breaks down.

■ This is not to say that public policy considerations are irrelevant, only that they are not of themselves dispositive. The public interest in prompt repayment of some kinds of student loan creditors may well be

---

11. It is worth noting that *Willis* confuses the "public policy" that might favor the repayment of student loans (an inquiry that takes the *creditor's* point of view) with the *debtor's* interest in repaying the debt (an inquiry that takes the *debtor's* point of view). The *debtor* has no particular investment in the public policy that favors minimizing the default rates suffered by student loan programs. The public's interest arises from the impact that nonpayment (and higher rates of default) has on the solvency and viability of student loan programs in general—the greater the threat to the economic viability of such programs, the greater the likelihood that such programs will not be able to make loans to future students. The public presumably has an interest in seeing that education is a benefit not restricted to the rich. The debtor may agree with that public policy, but that is not the same thing as saying that the debtor therefore has an *interest* in repaying such debts.

sufficiently high in some circumstances to warrant a separate classification and more favorable treatment. Federally guaranteed student loans, for example, might sometimes warrant special treatment because their non-payment imposes a direct burden on taxpayers.[12] Unfortunately, there can be no bright line test, as what constitutes "unfair" discrimination will be a function not only of the status and position of the creditor sought to be favored but a function as .well of the extent of the discrimination proposed.

■ The Chapter 13 Trustee has sought at least some minimal guidance from the court, a request for a "threshold" test. The Trustee certainly does not want to recommend for confirmation plans which run afoul of section 1322(b)(1), but equally does not want to have to object to every plan that proposes any discrimination whatsoever. The quest for a threshold is thus legitimate. So far as this court is concerned, if a given discrimination scheme results in a disparity of treatment such that unsecured creditors will receive not more than 20% less than they would have received in the absence of the proposed discrimination, then the Trustee need not object

to the proposal or bring it to the court's attention.[13] If the "swing" is greater than 20%, however, then the Trustee should not recommend confirmation and let the court decide the matter. Of course, the Trustee in a given case might feel it necessary to bring a given discrimination scheme to the attention of the court even if the swing is less than 20%, but for purposes of the "threshold" sought by the Trustee, the Trustee will be under no court compulsion to do so.

### Disposable Income

■ At least two courts have concluded that section 1325(b)(1)(B) permits debtors to treat student loan creditors differently after three years of plan payments. *In re Strickland*, 181 B.R. 598 (Bankr.N.D.Ala.1995); *In re Rudy*, 1995 WL 365370 (Bankr.S.D.Ohio 1993) (*en banc*). Section 1325(b)(1)(B) provides that, if the trustee or the holder of an allowed unsecured claim objects to a plan's confirmation, then the court may not approve the plan unless "the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first plan payment

12. It must be emphasized again here that discrimination may be justified in a given case given the status of the *creditor*, but is not justified simply because of the viewpoint of the *debtor*. It has frequently been argued, for example, that a student loan that yielded no benefit to the debtor is one that ought to be separately classified while a student loan that gave great benefit to the debtor should not be specially classified. The "Fly by Night Beautician's College and Truck Driving School" student loan and the HEAL loan that put a doctor through medical school are both nondischargeable but only one might be said to have been "beneficial" to the debtor. Debtors often argue that the "non-beneficial" loan ought to be specially classified and paid off in full because the debtor did not get the benefit of future income from the education the loan bought that would otherwise enable the debtor to repay the nondischargeable loan over an extended period of time. The debtor's bar will more easily accept the "no separate classification" of the HEAL loan because the education it paid for resulted in the debtor's having a substantial future income production ability, and the debtor in equity ought to pay for that benefit on her own, without foisting part of the cost of repayment onto her other creditors.

The problem with this entire line of thinking is that it is really a variant of the "impairment of the debtor's fresh start" argument discussed (and

rejected) *supra*. The debtor doctor accepts the fact that a good portion of the HEAL loan will remain to be paid at the conclusion of the bankruptcy, because the debtor doctor will presumably have enough of an income stream to pay for that debt—the debtor's fresh start will only be minimally impacted. The debtor who went to "Fly by Night" ended up with a worthless education that did not improve the debtor's future income prospects, yet will face a large student loan debt after bankruptcy unless the repayment of the student loan can be accelerated (at her other creditors' expense). Her fresh start will be impaired. As the touchstone of the distinction is the *debtor's* fresh start, rather than a consideration of features of the *creditor's* claim that warrant its specialized treatment, the distinction urged is not valid.

13. The percentage is to be applied to the percentage that unsecured creditors would receive were there no discrimination proposed. Thus, for example, if a given plan would yield a distribution to unsecured creditors of 65% if there were no discrimination, then the threshold would be derived by first applying 20% to 65, yielding 13. So long as the discrimination results in a disparity no greater than 13 points, it will not trigger the threshold. If the discrimination resulted in a payout to unsecured creditors of 55%, for example, the threshold would not be triggered.

is due under the plan will be applied to make payments under the plan." 11 U.S.C. § 1325(b)(1)(B).

In *Strickland,* the court instructed debtors that it would be that court's policy to confirm Chapter 13 plans in which debtors paid all unsecured creditors equally on a pro rata basis for the first thirty six months and devoted the remaining twenty four months solely to the payment of nondischargeable student loans. *Strickland,* 181 B.R. at 599. Likewise, the *Rudy* court held that a "debtor's voluntary payments from the 37th month up to and including the 60th month may be applied one hundred percent (100%) to a separate classification of student loans although no other unsecured general creditor is paid any amount during this extended period." *Rudy,* 1995 WL 365370 at 2. Both courts base their holdings upon the notion that a debtor is not obligated to propose a Chapter 13 plan for longer than thirty six months, and that the net disposable income test applies only to those first thirty six months. 11 U.S.C. §§ 1322(d), 1325(b).

Both these courts seem to miss the point of sections 1322(d) and 1325(b). The purpose behind these sections is not to prevent a debtor from extending his plan to provide a *greater* payout to creditors. The purpose is to prevent debtors from stretching the *same* payout over a longer period unless the court finds "cause" to allow the debtor two extra years. If a given plan happens to extend beyond thirty-six months and the court otherwise finds cause to permit such an extension, then the court must still evaluate whether the *overall* discrimination contained in the plan is "unfair." The *Strickland* and *Rudy* decisions presume that the question of unfair discrimination applies only to the first thirty-six months of the plan. The statute itself, however, draws no such distinction. While an enticing and creative alternative, then, this approach is not one which this court is comfortable employing on anything other than a case-by-case basis.

### Treatment as a Long Term Debt Pursuant to Section 1322(b)(5)

■ In struggling with how to best deal with the competing interests involved when nondischargeable student loans are in issue, many courts have foregone the section 1322(b)(1) unfair discrimination analysis entirely in favor of section 1322(b)(5). That section states that a plan may "provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due." 11 U.S.C. § 1322(b)(5).

The courts applying section 1322(b)(5) have found that a debtor's employing this provision to make ongoing payments on a student loan, even if doing so yields a greater percentage payout to the student loan creditor, cannot be "unfair discrimination because it is specifically sanctioned by the code." *In re Benner,* 156 B.R. 631, 634 (Bankr.D.Minn. 1993).

The Eighth Circuit explained the options a debtor may pursue without relying on separate classifications.

[T]here is nothing to stop a debtor from carrying out a Chapter 13 plan without separate classification of these claims. The debtor need only formulate a plan which pays student loan debtors pro rata with other unsecured creditors during the life of the plan and as a continuing obligation thereafter. Alternatively, the debtor may treat the student loan obligation as a long term indebtedness under § 1322(b)(5), curing arrearages within a reasonable time and thereafter maintaining regular payments. While such plan treatment may result in the debtor emerging from his Chapter 13 plan with a continuing obligation which may impede the debtor's fresh financial start, such an imposition may be the result envisioned by Congress in amending § 1328(a)(2) to make student loans nondischargeable in a Chapter 13 case unless the debtor can demonstrate the debt should be dischargeable under either provision of s 523(a)(8). Absent a showing that discriminatory treatment is necessary for the debtor to complete his Chapter 13 plan, separate classification of student loan and general

unsecured obligations cannot be permitted under the Bankruptcy Code.

*Groves,* 39 F.3d at 215 (quoting the bankruptcy court's judgment). Similarly, a bankruptcy court in Northern District of Florida, confronted with a debtor seeking to employ the section 1322(b)(5) alternative described in *Groves,* explained that although, [s]everal courts have applied the four part *Leser* test to determine whether separate classification is unfairly discriminatory[,] [i]t is unnecessary to engage in an analysis of these factors [here], because 1322(b)(5) prevents a finding of unfair discrimination in this case as a matter of law.[14] *Cox,* 186 B.R., at 747.

■ The rationale of these cases is irresistable. As Judge Dreher pointed out in *Benner,* section 1322(b)(5) applies by its terms to both secured and *unsecured* debt. *Benner,* 156 B.R., at 634. The provision for cure and maintenance of long-term obligations may well result in the long-term creditor's being paid more than other unsecured creditors, yet no limitations are placed on a debtor's right to employ the provision. Indeed, the statutory provision seems designed for just this sort of situation, to permit a debtor to take care of short-term obligations via a repayment program while maintaining long-term obligations with a minimum of disruption. As a matter of law, the maintenance of long-term debt obligations according to their terms does not result in "unfair discrimination," in no small part because such obligations are not being satisfied out of the plan payment (with the possible exception of the "cure" of arrearages) but out of the debtor's income. This is

precisely how home mortgages are routinely handled in most chapter 13 bankruptcy cases—the arrearages are paid out over time from the plan payments, while the debtor makes the current house payments out of her income.[15]

The payment of long-term obligations on a current basis also does not run afoul of section 1325(b), with its requirement that all of a debtor's net disposable income be devoted to "plan payments." Maintaining the current payments on a long-term obligation is one of the provisions permitted to be contained in the debtor's *plan.* 11 U.S.C. § 1322(b)(5) ("... the *plan* may—... provide for ... maintenance of payments while the case is pending on any unsecured claim ... on which the last payment is due after the date on which the final payment under the plan is due"). Even if the debtor, rather than the trustee, is making these "current payments," they are nonetheless "plan payments" insofar as the section 1325(b) analysis is concerned.[16] Thus, if a student loan also qualifies as a long-term obligation under section 1322(b)(5), a debtor's plan may provide for the cure of any arrearages and the maintenance of payments without running afoul of the "unfair discrimination" limitations of section 1322(b)(1).[17]

### Conclusion

The debtors in this case may or may not benefit from the conclusions reached in this case. Certainly there is little about their student loans to distinguish them on public policy grounds from other student loans, and the level of discrimination is significant

---

**14.** In *Cox,* treating the student loan indebtedness as a long term debt decreased the payments to the general unsecureds by 42% of what they would have received had all creditors received their pro rata share. (instead of receiving $9,500 over the life of the plan they received $4,800). *Id.* at 746–47.

**15.** The court is aware of the practice in some districts of having the chapter 13 trustee make the current house payments out of the plan payment. Nothing in section 1322(b)(5) prohibits such an arrangement. Indeed, that practice confirms that the debtor's making these payments may actually be functioning as the disbursing agent for these long-term payments—so that they ought not be considered to be "net disposable income." *See* discussion *infra.*

**16.** If the debtor makes the payments, the trustee does not insist on recovery of the chapter 13 trustee's fee out of those payments. This has been the practice in this district for some years now, and is supported by Fifth Circuit precedent. *See Matter of Foster,* 670 F.2d 478, 491 (5th Cir.1982) (giving the bankruptcy court "much discretion" with respect to the computation of the fee due to the standing chapter 13 trustee).

**17.** With one caveat: the payout of the arrearages over time, in competition with other creditors, must be done in a fashion which does not "unfairly discriminate."

enough to be termed "unfair." It may well be that the loans are also "long term" debts within the meaning of section 1322(b)(5), permitting maintenance of their payments on a current basis as they request. If they are not long-term however, then continuing to make payments to the student loan lenders will run afoul of both the "net disposable income" requirements of section 1325(b) and the "unfair discrimination" limitations of section 1322(b)(1). The court has reset the confirmation hearing to the next confirmation docket to give the debtors an opportunity to examine their options.

