**In re Kendra COLLEY, Debtor.**

**No. 99–2981–3F3.**

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Oct. 30, 2000.

D. Lamar Smith, Jacksonville, FL, for Debtor.

Mamie L. Davis, Chapter 13 Trustee.

Marsha M. Brown, Jacksonville, FL, for Chapter 13 Trustee.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This Case is before the Court for confirmation of Debtor's Third Amended Chap-

ter 13 Plan (Doc. 28.) and on an objection to confirmation raised by the Chapter 13 Trustee ("Trustee") at the confirmation hearing held August 22, 2000. Upon evidence presented at the confirmation hearing and upon arguments and submissions of counsel, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

On April 26, 1999, Debtor filed a voluntary Chapter 7 petition. On December 15, 1999, the Court converted the Case to a Chapter 13.

Debtor concedes that she owes $13,630.91 in student loan debt to Intuition, Inc. ("Intuition"). Debtor admits in her Third Amended Chapter 13 Plan that the debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(8), which provides that federally guaranteed student loan debt may not be discharged in bankruptcy.[1]

Debtors' Third Amended Plan provides that the Trustee disburse to Intuition the contractual payments of $161.78 per month through the life of the Plan. The payments would reduce Debtor's indebtedness to Intuition by $4,853.40, or about 36%, over the 36–month proposed plan.

Debtors' Third Amended Chapter 13 Plan provides that Trustee disburse nothing to Debtor's other unsecured creditors from months one through 20 of the Plan and $38.45 per month from months 21 to 36. This would result in a pro rata distribution of $615.20, or about 2% of each unsecured creditor's claim, over the 36–month proposed Plan.

At the confirmation hearing on August 22, 2000, the Trustee objected to confirmation of the Plan on the basis of Debtor's treatment of Intuition. The Court took the matter under advisement due to a split of authority in this area.

## CONTENTIONS OF THE PARTIES

The Trustee argues that, pursuant to 11 U.S.C. § 1322(b)(1), a court may not confirm a plan that provides for contractual payment of a nondischargeable student loan where other unsecured creditors receive only a minimal pro rata distribution because such a plan is unfairly discriminatory.

Debtor counters that, under 11 U.S.C. § 1322(b)(5), a court may confirm a plan that provides for cure of arrearages and maintenance of contractual payments on a student loan obligation on which the last payment is due after the date on which the final payment under the plan is due.

## CONCLUSIONS OF LAW

**1. ARE LONG–TERM NONDISCHARGEABLE STUDENT LOAN DEBTS EXEMPT FROM "UNFAIR DISCRIMINATION" SCRUTINY?**

**A. Discrimination on the basis of nondischargeability is per se unfair under § 1322(b)(1).**

■ Section 1322(b)(1) reads, in relevant part,

(b) Subject to subsections (a) and (c) of this section, the plan may—

(1) designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated

· · ·

11 U.S.C. § 1322(b)(1) (2000). This provision implements the principle of "equal treatment and strict prioritization of

---

1. Section 523(a)(8) is charged against the broad Chapter 13 discharge by 11 U.S.C. § 1328(a)(2).

claims" that, in tandem with the "fresh start" policy, provides the normative backbone of the Code. *See In re Chandler,* 210 B.R. 898, 902 (Bankr.D.N.H.1997). A debtor bears the burden of showing that a plan does not discriminate unfairly. *See Groves v. LaBarge, (In re Groves),* 39 F.3d 212, 214 (8th Cir.1994).

Section 1328(a)(2) provides, in relevant part,

> (a) As soon as practicable after completion by the debtor of all payments under the plan ... the court shall grant the debtor a discharge of all debts provided for by the plan ... except any debt—
>
> (2) of the kind specified in paragraph (5), (8), or (9) of section 523(a) of this title ...

11 U.S.C. § 1328(a)(2) (2000). Section 523(a)(5) provides for the exception from discharge of child support obligations. *See* 11 U.S.C. § 523(a)(5) (2000). Section 523(a)(8) provides for the exception from discharge of federally guaranteed student loans. *See* 11 U.S.C. § 523(a)(8) (2000). Section 523(a)(9) provides for the exception from discharge of debt incurred as the result of death or personal injury caused by a debtor's operation of a motor vehicle while intoxicated. *See* 11 U.S.C. § 523(a)(9) (2000).

█ The completion of a Chapter 13 plan does not discharge these three types of debt. Completion of a plan discharges every other debt no matter how small the distribution. This fact gives a debtor a strong incentive to pay off as much as possible of these nondischargeable debts through the plan while paying as little as possible of those debts that will disappear after plan completion. *See In re Coonce,* 213 B.R. 344, 346 (Bankr.S.D.Ill.1997). However, § 1322(b)(1) prohibits a plan in which a debtor devotes a significantly larger amount of his disposable income toward the payment of nondischargeable debts simply because they are nondischargeable. *See Groves,* 39 F.3d at 215.

█ In order to discriminate in favor of nondischargeable debts such as student loans, a debtor must find some "fair" basis either in the Code or congressional policy. Enterprising debtors' attorneys quickly seized upon 11 U.S.C. § 1322(b)(5) as the optimal Trojan horse in which to sneak discriminatory treatment of nondischargeable debt through confirmation. Some debtors bolster the § 1322(b)(5) argument by asserting a policy-driven judicial priority exists for nondischargeable student loan debt. Bankruptcy courts have reacted differently to these tactics.

**B. The minority view: Plan provisions for payment of student loans which qualify for § 1322(b)(5) treatment are exempt from § 1322(b)(1) "unfair discrimination" scrutiny.**

Section 1322(b)(5) provides, in relevant part,

> (b) Subject to subsections (a) and (c) of this section, the plan may—
>
> (5) ... [P]rovide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due ...

11 U.S.C. § 1322(b)(5) (2000). Debtors traditionally use this subsection to decelerate, cure and maintain payments on defaulted mortgages. *See Coonce,* 213 B.R. at 345, n. 2.

A minority of courts have found that § 1322(b)(5) provides a debtor with a per se acceptable method to discriminate between long-term nondischargeable unsecured debt and other unsecured debt in a Chapter 13 plan. *See e.g. In re Cox,* 186 B.R. 744, 746 (Bankr.N.D.Fla.1995); *See*

*also In re Benner,* 156 B.R. 631, 634 (Bankr.D.Minn.1993). According to these courts, a debtor may not accelerate the student loan payments during the plan but may cure arrearages and make contractual payments without risking violation of the § 1322(b)(1) "unfair discrimination" standard. *See Cox,* 186 B.R. at 746.

These courts offer various policy-based rationales for creating an exception to § 1322(b)(1) for long-term nondischargeable debts.

First, the minority courts argue that such debts are entitled to a judicial priority. These courts assert that certain exceptions from discharge give rise to inferences that Congress intended for the courts to create judicial priorities in favor of the debts covered by those exceptions. *See e.g. In re Leser,* 939 F.2d 669, 672 (8th Cir.1991).

One such judicial priority has found general acceptance. Most courts have held that family support obligations, nondischargeable pursuant to § 523(a)(5) and § 1328(a)(2), may be prioritized in this fashion because Congress, by making family support nondischargeable, evidenced intent to favor full payment of family support obligations. *See Leser,* 939 F.2d at 672. Apparently the majority of courts have concluded that a debtor may discriminate at will in favor of family support because Congress intended to elevate families above other unsecured creditors by enacting § 523(a)(5).

Some courts following the *Cox* and *Benner* line extend *Leser* to student loans by reasoning that Congress must have similarly intended that debtors be allowed to discriminate in favor of student loan creditors. *See Benner,* 156 B.R. at 634.[2]

These courts then find that this priority alone, or in combination with § 1322(b)(5), provides debtors with a per se fair method of discrimination in favor of long-term student loan debtors. *See id.*

Second, other minority courts assert that a § 1322(b)(5) end-run around § 1322(b)(1) must be allowed for nondischargeable debts in order to fully effectuate the "fresh start" policy. *See Cox,* 186 B.R. at 745.

Finally, some courts fret that § 1322(b)(5) would be compromised and Congressional intent thwarted if the section only exempted one form of unsecured debt, family support obligations, from § 1322(b)(1) scrutiny. *See Cox,* 186 B.R. at 746.

## C. The majority view: Plan provisions for long-term debts which qualify for § 1322(b)(5) treatment must also pass § 1322(b)(1) "unfair discrimination" scrutiny.

The majority of courts reject the *Benner* approach and give effect to both § 1322(b)(1) and § 1322(b)(5) by subjecting a plan that provides for "cure and maintain" treatment of long-term student loans to "unfair discrimination" scrutiny. *See, e.g. In re Thibodeau,* 248 B.R. 699, 703 (Bankr.D.Mass.2000); *See also Coonce,* 213 B.R. at 346.

The language of the statute supports this conclusion. As one court put it,

[If]Congress had wanted courts not to consider whether putting unsecured creditors in a separate class and providing for full monthly payments on the unsecured creditors' claims during the course of the plan constituted unfair discrimination, Congress would have draft-

---

**2.** The *Benner* court accomplished this sleight-of hand by plugging the judicial priority into the "good faith" element of the *Leser* test for unfair discrimination. The Court will address the dangers of the *Leser* test in a moment.

ed section 1322(b)(5) to read "notwithstanding paragraphs (1) and (2) of this subsection ..." Congress did not draft the statute in such a manner.

*Chandler,* 210 B.R. at 903.[3]

Additionally, the rules of construction purportedly lead to this conclusion. Congress explicitly exempted only co-signed consumer loans from "unfair discrimination" scrutiny in § 1322(b)(1) itself. The doctrine of *inclusio unius exclusio alterious*[4] mandates the conclusion that Congress knew how to except long-term student loan debts from § 1322(b)(1) but chose not to. *See Coonce,* 213 B.R. at 348. "Any classification of unsecured claims must pass a test of fairness unless that classification involves consumer debts for which co-signers were obtained." *In re Williams,* 253 B.R. 220, 225 (Bankr. W.D.Tenn.2000).

The majority courts also reject the minority's judicial priority and "fresh start" policy arguments.

The majority courts find fault with some minority courts' conclusion that Congress, by providing for the exception from discharge of student loans, intended to empower the judiciary to fashion a permissive priority for student loans. *See Coonce,* 213 B.R. at 348. The Congressional policies behind § 1328(a)(2) and the "fresh start" policy behind the Code itself are patently insufficient to justify the creation of such priorities in the student loan context. *See Chandler,* 210 B.R. at 902. The majority courts therefore reject the analogy between prioritized family support obligations and student loan obligations. *See Coonce,* 213 B.R. at 346, n. 5. One minority

court phrased the majority conclusion best: "The Federal government's need for the repayment of student loans, while an important policy objective, does not approach a family's need for the immediate payment of alimony or child support obligations." *Cox,* 186 B.R. at 746.

The majority similarly dismisses the invocation of the "fresh start" policy as justification for discrimination. These courts find the "fresh start" concept in danger of being rendered meaningless by overuse in the pursuit of "equitable" but quizzical outcomes. "Reliance on idealized notions of 'fresh start', divorced from the very statute that provides that fresh start, is inappropriate." *In re Colfer,* 159 B.R. 602, 609–610 (Bankr.D.Me.1993). "No one would seriously argue that a debtor's interest in a fresh start would justify discrimination in favor of a debt incurred through fraud just because the debt happens to be nondischargeable under § 523(a)(2) ... Yet that is the essence of the argument ..." *In re Sullivan,* 195 B.R. 649, 654 (Bankr.W.D.Tex.1996).

Additionally, the majority notes that use of § 1322(b)(5) to trigger such a priority would be arbitrary and would lead to anamolous results. It would be nonsensical to allow a debtor to prioritize in a 36–month plan a student loan with 37 monthly payments remaining where the same debtor could not so discriminate in favor of an identical student loan with 36 monthly payments remaining. *See Coonce,* 213 B.R. at 348.

Finally, the majority courts have no qualms about limiting the application of § 1322(b)(5) to secured debts and unse-

---

**3.** The *Chandler* decision strikes a dizzying balance between the minority and majority positions. The *Chandler* court found that § 1322(b)(5) student loans must undergo § 1322(b)(1) scrutiny, yet found that § 1322(b)(5) debts will always pass the

§ 1322(b)(1) test because they fall under § 1322(b)(5).

**4.** "The inclusion of one is the exclusion of another."

cured family support obligations. Congress drafts and enacts plenty of narrow laws that are not carefully cross-referenced or integrated into the chapter, title, or code into which they are dropped.

#### D. Application to the instant case.

■ This Court finds the majority interpretation persuasive. Student loan debts that qualify for § 1322(b)(5) treatment must nonetheless pass § 1322(b)(1) "unfair discrimination" muster. The Court will not allow student loan debtors to make an end run around § 1322(b)(1) by using § 1322(b)(5) as a pretense for classification where nondischargeability must be the true motivation for discrimination. *See Williams*, 253 B.R. 220, 230. As previously noted, nondischargeability is not a "fair" basis for discrimination. *See Groves*, 39 F.3d at 215.

Debtor did not articulate any motivation for "cure and maintain" treatment of her student loans aside from their nondischargeability. Debtor's counsel cannot be faulted for failure to bring forward an alternative justification as the Court likewise finds it impossible to imagine an alternative. Why would a debtor choose to pay the full contractual amount of a dischargeable unsecured claim out over time and simultaneously preserve the claim beyond completion of the plan? Make the claim nondischargeable, and suddenly the § 1322(b)(5) option becomes attractive, because the claim will survive discharge regardless.

The Court is additionally unable to conceive of why it should condone discrimination in favor of Intuition during the Plan as a matter of law when Intuition's claim is immune from discharge and thus already favored after the Plan's completion. Debt-

or failed to bring forward any sufficiently stirring public policy concern to justify such deluxe treatment.[5]

Therefore, the Court finds that it must now inquire into whether the Plan in the instant case unfairly discriminates in favor of Intuition by providing it contractual payments apart from the pro rata distribution afforded other unsecured creditors.

#### 2. DOES THE PLAN IN THE INSTANT CASE UNFAIRLY DISCRIMINATE IN FAVOR OF THE STUDENT LOAN CREDITOR BY PROVIDING FOR CONTRACTUAL PAYMENTS ON THE STUDENT LOAN APART FROM PRO RATA DISTRIBUTION?

#### A. Selection of an unfair discrimination standard in § 1322(b)(5)-qualified student loan situations.

■ A debtor may freely discriminate between unsecured creditors in a Chapter 13 plan so long as the discrimination is "fair." *See Coonce*, 213 B.R. at 346. The determination of discrimination "fairness" lies within the discretion of the bankruptcy judge and must be made on a case-by-case basis. *See Groves*, 39 F.3d at 214. The Code is maddeningly silent as to the meaning of the term "fair" and as to what method should be employed to determine "fairness." *See id.* The Eleventh Circuit has not selected a test by which this Court may divine whether or not a particular plan proposing discrimination in favor of a § 1322(b)(5) student loan is "unfair."

Only the Eighth Circuit has provided guidance for lower courts. The *Leser* court established a four-part "fairness" test that has become quite popular largely

---

**5.** Once again, note that family support obligations are favored after discharge and during the plan because of the perceived intensity

of the Congressional desire that such loans be paid off.

because of its singularity. According to the *Leser* court, a plan discriminates "fairly" between unsecured creditors if:

(1) the discrimination has a reasonable basis;

(2) the debtor cannot carry out the plan without discrimination;

(3) the plan is proposed in good faith; and

(4) the degree of discrimination is directly related to the rationale for the discrimination.

*See Leser,* 939 F.2d at 672.

However, this Court finds the *Leser* test ill-suited to consistent resolution of § 1322(b)(1) disputes.[6]

The Court will address its qualms with the test element by element.

First, a debtor almost always has a "reasonable" basis for discrimination. A debtor's interest in paying down nondischargeable student loan debt is "reasonable" though illegitimate. *See Thibodeau,* 248 B.R. at 705. The "reasonable" requirement is a legalism that lends itself to interpretations of endless variety. "The 'reasonable basis' formulation is no more useful than the undefined statutory concept of 'discriminate unfairly.'" *McCullough v. Brown (In re Brown),* 162 B.R. 506, 508 (N.D.Ill.1993). The only imaginable reason to discriminate in favor of student loans under § 1322(b)(5) is their nondischargeability. Nondischargeability is not a fair ground on which to discriminate. Therefore, courts must read some external meaning into this element

through the employment of their personal priorities and caprices. Such creativity breeds unpredictability.

The necessity element has two flaws. First, a debtor who otherwise qualifies for Chapter 13 can almost always create a "fair"—read "pure pro rata"—distribution of his disposable income. *See Williams,* 253 B.R. 220, 230. Therefore it is never "necessary" to discriminate. The pro rata distribution percentage may be minimal, but minimal pro rata distributions are hardly unheard of.[7] A "fresh start" may be impaired, but there is no absolute right to a complete "fresh start." Second, even if the pro rata distribution is reduced to a percentage so small as to qualify as bad faith or to fail the liquidation analysis, § 1322(b)(1) does not provide an exception to the "unfair discrimination" bar for debtors who can only implement a plan by unfairly discriminating. If a debtor cannot propose any plan that satisfies all the provisions of § 1322, then the debtor does not belong in Chapter 13. Obviously debtors choose to enter Chapter 13 because it offers them some personal benefit over Chapter 7. A court should not provide such benefit to a Chapter 13 debtor without first requiring that a debtor propose a plan that complies with the Code. *See id.* at 231.

The good faith element does not belong in the § 1322(b)(1) inquiry. A Chapter 13 plan will be tested for good faith under 11 U.S.C. § 1325(a)(3). Good faith may be important, but it is not so paramount that

---

**6.** "In the absence of a congressional directive defining (or even fleshing out) the term 'unfairly' ... courts must at least try to formulate some reasoned approach to assessing fairness vel non—lest the process reduce itself to an ad hoc variant on Justice Stewart's famed 'I know it when I see it' aphorism..." *Brown,* 162 B.R. at 508.

**7.** One court found that discrimination was necessary because the debtor, absent discrimination in favor of nondischargeable student loans, could not possibly propose a plan which would give him a perfectly "fresh start." *See Benner,* 156 B.R. at 633–634. This remarkable interpretation of the necessity element illustrates its essential meaninglessness.

it should be applied to unrelated sections of the Code. Such tossing around of the term distorts the actual good faith inquiry. For example, the *Thibodeau* court somehow found that a debtor's plan unfairly discriminated because the debtor did not put all of his disposable income into the plan, thus evidencing bad faith and flunking element three of the *Leser* test. *See Thibodeau*, 248 B.R. at 705. The court in *Thibodeau* utilized the "disposable income" requirement of 11 U.S.C. § 1325(b) to determine that the debtor's plan lacked "good faith" pursuant to § 1325(a)(3) and therefore was unconfirmable due to "unfair discrimination" barred by § 1322(b)(1). Such contortions confuse other courts in search of guidance and obscure the intended application of the Code.

Finally, the relationship element bookends the *Leser* test with another facially ambiguous opening for creative judges and attorneys. As noted above, a debtor will almost always have some reasonable rationale for discrimination, however unfair. Should an unfair rationale for discrimination, such as nondischargeability, transform into a fair one simply because it "directly" causes disbursement discrimination?

Many courts sensibly avoid the language of the relationship element and recharacterize it as a proportional analysis.[8] *See Thibodeau*, 248 B.R. at 706. These courts compare the percentage paid out to the favored student loan creditor with the tiny fractional bankruptcy dollars doled out to the other unsecured creditors. *See Gonzalez*, 206 B.R. at 241 (charting earlier determinations of unfairness and the corresponding proportions between student loan payment and pro rata distribution). This Court finds it wise to avoid the implementation of a standard dependent upon a court's arbitrary choice of a tolerant mathematical gap between favored and disfavored creditors.

The Court chooses to abandon the hopelessly ad hoc application of the *Leser* test and elects to adopt a strict bright line rule on unfair discrimination in student loan cases. "Creditors in this particular context need a bright-line test, not a balancing test, to know when discrimination is fair or unfair, so that it is not necessary to litigate every disparate treatment for a determination by the Court as to its fairness." *Chandler*, 210 B.R. at 903.

■■ Section 1322(b)(1) is a creditor-protection provision. *See Chandler*, 210 B.R. at 903. Therefore, any discrimination under § 1322(b)(1) should provide a substantial benefit to the disfavored creditors, even if that benefit provides some concurrent benefit to a debtor.[9] *See id.* Therefore, any discrimination, no matter the proportions, that harms, or does not benefit, disfavored creditors is unfair and must be removed in order for a court to confirm a plan.

■ In other words, if a Chapter 13 Plan provides for full contractual payments that amount to a certain percentage of the

---

8. Again it is instructive to note the minority's strange application of the *Leser* test in exposing its shortcomings. The *Benner* court, in applying the relationship element, found that depriving the disfavored unsecured creditors of 14% of the pro rata pie in order to pay off a student loan creditor was justified solely by the "extreme impairment of debtor's fresh start" the student loan would cause. *See Benner*, 156 B.R. at 634.

9. Benefit to creditors must be viewed from the disfavored creditors' standpoint because the favored creditor always benefits. Section 1322(b)(1) is meant to protect disfavored creditors, not favored ones—favored creditors need no protection. *See Brown*, 162 B.R. at 512.

student loan creditor's claim while providing for a lower percentage of other unsecured creditor's claims to be paid off through pro rata distribution, then the plan discriminates unfairly under § 1322(b)(1) and may not be confirmed. For example, if the contractual payments over three years amount to 36% of the student loan creditor's claim and the separate pro rata distribution amounts to 35% of the other unsecured creditors' claims, then unfair discrimination exists and the plan may not be confirmed. There is no *de minimis* exception to § 1322(b)(1).

### B. Application to the instant case.

 There are situations wherein a debtor's use of § 1322(b)(5) to pay contractual student loan payments may not injure the disfavored creditors or may even benefit them. The most obvious situation arises where the disfavored creditors receive full payment of their claims through pro rata distribution.[10] *See e.g. In re Foreman,* 136 B.R. 532, 535 (Bankr. S.D.Iowa 1992). But the Court is not faced with such a scenario. Debtor proposes to pay non-student loan unsecured creditors just 2 % of their claims through the Plan. Those creditors will not even see those two pennies until almost two years of Plan time go by.

Debtor's discrimination results in injury to the disfavored creditors. The disfavored creditors would receive a greater percentage of their claims from pro rata distribution if the difference between the contractual student loan payments and the student loan creditor's pro rata entitlement were thrown back in the pot. In other words, a disproportionate amount of

Debtor's disposable income flows to Intuition. Therefore, the discrimination in favor of Intuition is unfair because it harms the disfavored creditors by lowering the percentage of Debtor's disposable income available for pro rata distribution. Additionally, the Court anticipates that Debtor, free of any dreams of nondischargeability-based discrimination, will propose an amended Plan that does not delay any pro rata distribution until 2002. There is no motivation to delay pro rata distribution aside from the desire to pay down the nondischargeable student loan as soon as possible in anticipation of a quiet dismissal, unnoticed by creditors with little interest in policing Debtor and insuring that their paltry payday comes to pass.

### CONCLUSION

Debtor's Third Amended Chapter 13 Plan unfairly discriminates in favor of Debtor's nondischargeable long-term student loan debt by providing for contractual payment of the debt apart from the lesser pro rata distribution afforded other unsecured creditors. Therefore, pursuant to § 1322(b)(1), the Plan cannot be confirmed because it contains an impermissible provision.

The Court will enter a separate Order in Accordance with these Findings of Fact and Conclusions of Law.

---

**10.** One court found that a plan unfairly favored a student loan creditor and could not be confirmed despite a 100% pro rata distribution. *See In re Eiland,* 170 B.R. 370, 378 (Bankr.N.D.Ill.1994). The Court in *Eiland* feared that debtor would pay off the student loan and dismiss before the other unsecured creditors received their full payout. *See id.* That is a concern in the cases such as the instant one, where unsecured creditors receive nothing for the first twenty months of the Plan.