**In re George HATZENBUEHLER, III & Cherryl Hatzenbuehler, Debtors.**

**No. 401–41331–DML–13.**

United States Bankruptcy Court, N.D. Texas, Fort Worth Division.

Aug. 26, 2002.

Brad Repass, Haynie, Rake & Repass, Dallas, TX, for defendant.

David Russell Sweat, Arlington, TX, for plaintiff.

## *MEMORANDUM OPINION AND ORDER*

DENNIS MICHAEL LYNN, Bankruptcy Judge.

This matter comes before the Court on the Objection (the Objection) of the Standing Chapter 13 Trustee (the Trustee) to confirmation of Debtors' Chapter 13 debt adjustment plan. Debtors filed a response (the Response) to the Objection. The Objection was heard on February 14, 2002, and, at the Court's request, the parties thereafter filed supplemental briefs. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(b)(1), and this Memorandum constitutes its findings of fact and conclusions of law. Fed. R. Bankr.P. 7052 and 9014.

### I. Background

Debtors are shareholders and officers of Cherco, Inc. (Cherco), a Texas corporation. In June 1998, Cherco entered into an agreement (the Business/Manager Agreement) with Bank of the Southwest (the Bank), pursuant to which Cherco sold certain accounts receivable to the Bank. Under specific conditions set forth in the Business/Manager Agreement, the Bank

had the option to require Cherco to repurchase certain of the accounts receivable.[1] Until the Bank's exercise of the put, however, Cherco had no liability to the Bank.

Debtors, in their individual capacities, guaranteed payment of any indebtedness owed by Cherco to the Bank under the Business/Manager Agreement. Each of the guaranties (the Guaranties) was a guaranty of payment, rather than a guaranty of collection. As such, Debtors' liability thereunder arose immediately upon the Bank's put of an account receivable to Cherco.[2]

Through February 1999, Cherco sold certain of its accounts receivable to the Bank. On March 22, 1999, Cherco filed a petition for relief under chapter 11 of title 11 of the United States Code (the Bankruptcy Code). On December 21, 1999, Cherco's chapter 11 case was converted to a case under chapter 7, which is presently pending in this Court. Since Cherco's original filing, the Bank has continued to assert its claim of ownership over substantially all of Cherco's prepetition accounts receivable. This Court has received no evidence indicating that the Bank, at any time, exercised its right to require Cherco to repurchase accounts receivable.

On February 28, 2001 (the Petition Date), Debtors filed their joint voluntary petition for relief under chapter 13 of the Bankruptcy Code. In their original schedules, Debtors listed the Bank as a general unsecured creditor holding a contingent and disputed claim in the amount of $0.00. The total unsecured debt listed on Debtors' initial schedules was $287,359.36[3] and the total secured debt listed on Debtors' initial schedules was $35,623.15.

On March 12, 2001, Debtors amended their schedules. In their amended schedules, Debtors again listed the Bank as a general unsecured creditor holding a contingent and disputed claim in the amount of $0.00. The total unsecured debt listed on Debtors' amended schedules was $215,-356.36[4] and the total secured debt listed on Debtors' amended schedules was $105,623.15. The reduction in scheduled unsecured indebtedness and the corresponding increase in scheduled secured indebtedness were attributable to the reclassification from unsecured to secured of a $70,000 debt shown as owed to General American Life Insurance Company (GALI) on account of a loan against the cash value of a life insurance policy.

On March 23, 2001, the Bank filed a nonpriority, unsecured proof of claim in the amount of $914,655.93 on account of the Guaranties. On October 17, 2001, Debtors filed an objection to the Bank's claim on the basis that it exceeded the amount legally owed by debtor [sic]. On January 24, 2002, the Bank responded to Debtors' claim objection and filed an objection to the confirmation of Debtors' chapter 13 plan. On February 1, 2002, the Bank filed an amended unsecured proof of claim in the amount of $860,026.34. Also on February 1, 2002, Debtors and the Bank reached an agreement whereby the Bank withdrew its objection to the confirmation of Debtors' chapter 13 plan, and Debtors agreed to allow the Bank an unse-

1. *See* Business/Manager Agreement § 3.1.

2. *See generally In re Pulliam,* 90 B.R. 241, 243 (Bankr.N.D.Tex.1988) (discussing conditional and absolute guaranties).

3. This total represents $59,051.73 in priority unsecured debt and $228,307.63 in general unsecured debt.

4. This total represents $59,051.73 in priority unsecured debt and $156,304.63 in general unsecured debt.

cured claim in the amount of $130,000.[5] In the Objection, the Trustee asks this Court to deny confirmation of Debtors' plan because, due to the settlement reached between Debtors and the Bank, Debtors' unsecured debts exceed the debt limitations of section 109(e) of the Bankruptcy Code.

## II. Issue

The issue before the Court is what effect, if any, (a) postpetition events and (b) disputes related to prepetition debts, should have on a debtor's eligibility to use chapter 13 of the Bankruptcy Code, as determined by section 109(e).

## III. Discussion

Section 109(e) of the Bankruptcy Code, which establishes eligibility for chapter 13 of the Bankruptcy Code, states:

> Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $250,000 and noncontingent, liquidated, secured debts of less than $750,000, or an individual with regular income and such individual's spouse ... that owe, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $250,000 and noncontingent, liquidated, secured debts of less than $750,000 may be a debtor under chapter 13 of [the Bankruptcy Code].[6]

On April 1, 1998, the limits for unsecured and secured debts were raised to $269,250 and $807,750, respectively.[7] As these limits were in effect on the Petition Date, the Court will use them in determining this issue.[8]

At first blush, determining eligibility for chapter 13 would appear to be a straightforward exercise. As the Trustee and Debtors have demonstrated through the Objection and Response, however, the Bankruptcy Code leaves open a number of issues. And, unfortunately, cases addressing those issues raise still other questions. For example, the Bankruptcy Code clearly excepts from the section 109(e) analysis debts which are contingent or unliquidated on the date the debtor's petition is filed. It is also well settled that disputed debts *are* included in the section 109(e) eligibility analysis.[9] A question that has arisen in numerous cases is at what point a dispute over a particular debt renders that debt unliquidated or contingent. Another common question is whether, and to what extent, postpetition developments should be considered in determining the debtor's eligibility for chapter 13 relief.

The importance of these issues is obvious; their resolution may dictate whether a debtor can proceed under chapter 13, or whether that debtor must resort to relief under another chapter of the Bankruptcy Code or dismiss his case. In providing guidance, the Court notes that it is of the utmost importance to debtors and creditors alike that a final determination on a particular debtor's eligibility for chapter 13 be made as early in the case as possible.

---

**5.** Debtors' proposed plan contemplates a dividend of approximately 15% for allowed nonpriority unsecured claims.

**6.** 11 U.S.C. § 109(e).

**7.** On April 1, 2001, these amounts were further increased to $290,525 and $871,550.

**8.** *See* 11 U.S.C. § 104(b)(3).

**9.** *See In re Horne,* 277 B.R. 712, 715 (Bankr. E.D.Tex.2002) ([t]he general rule is that disputed debts should be included in the [section] 109(e) debt calculations); *In re Visser,* 232 B.R. 362, 365–65 (Bankr.N.D.Tex.1999) (same). *See also United States v. Verdunn,* 89 F.3d 799, 802 n. 9 (11th Cir.1996) (referring to the overwhelming body of authority supporting the proposition that a disputed debt should be included in the section 109(e) debt calculation).

Any solution that would require the Court to engage in a lengthy fact finding process would add dramatically to the cost of chapter 13, inject an unwarranted element of uncertainty into the section 109(e) analysis and hamper the rehabilitative goals of chapter 13.

### A. Disputed Debts

In their schedules, Debtors have classified the Bank as a creditor holding a disputed claim. It seems sensible that, unless the equities of the case require a different result, a debt denominated as disputed should be included in the section 109(e) eligibility analysis if, on its face, it is a legally enforceable debt on the petition date.[10] If, for example, the putative debtor was indebted on a note or other instrument, and the only dispute of that debt was a contested, fact-dependent defense to liability on the instrument, this rule would favor inclusion of the indebtedness in the section 109(e) analysis.

Conversely, where the dispute requires a creditor to establish the debtor's liability, the debt should not count for section 109(e) purposes. For example, if the payee under an instrument alleges that, under an alter ego theory, the debtor (rather than the named obligor) is the party actually obligated on the instrument, the debt should not be considered for purposes of determining eligibility for chapter 13. A facial review of the instrument would not indicate that the debt was a legally enforceable obligation of the debtor on the petition date.

In this case, the Debtors are liable to the Bank, if at all, through their undertakings in the Guaranties to pay certain of Cherco's obligations to the Bank. Examination of the Guaranties leads to the conclusion that Debtors had a legally enforceable obligation to the Bank for whatever amount Cherco owed to the Bank under the Business/Manager Agreement. For purposes of section 109(e), the relevant inquiry is how much Cherco owed to the Bank on the Petition Date.[11] A dispute by Debtors of this liability would not ordinarily exclude it from the section 109(e) eligibility analysis.

### B. Postpetition Developments

In their schedules, the Debtors also classified the Bank's claim as contingent. The Trustee has asked this Court to rule that, in light of Debtors' postpetition agreement with the Bank to fix the amount in which the Bank's claim will be allowed for purposes of plan distributions, this claim should be included in the section 109(e) eligibility analysis.

Debtors have cited to this Court a number of decisions supporting the proposition that chapter 13 eligibility should be determined by reference to a debtor's originally filed schedules, checking only to ensure the schedules were filed in good faith.[12]

10. *Accord In re Cross Timbers Ranch,* 151 B.R. 923, 925 (Bankr.W.D.Mo.1993) (when determining whether a party is eligible for chapter 12, if the debt is prima facia valid, most courts have held that it should be counted although debtor may have some defenses to pay or rights of offset); *In re Quintana,* 107 B.R. 234, 239–40 (9th Cir. BAP 1989), *aff'd,* 915 F.2d 513 (9th Cir.1990) (in determining whether putative chapter 12 debtor qualified as a family farmer under section 101(18)(A), dispute over whether debtor possessed counterclaim to facially valid claim not germane to determining chapter 12 eligibility).

11. As is discussed below in Section III.B., however, it does not appear that Cherco owed any debt to the Bank on the Petition Date.

12. *See Scovis v. Henrichsen,* 249 F.3d 975, 981–84 (9th Cir.2001); *In re Slack,* 187 F.3d 1070, 1073 (9th Cir.1999); *In re Pearson,* 773 F.2d 751, 756–57 (6th Cir.1985); *In re Tabor,* 232 B.R. 85, 89 (Bankr.N.D.Ohio 1999). *See*

On the authority of these cases, Debtors ask this Court to ignore all postpetition events, even those arguably germane to the determination of Debtors' unsecured debt position on the Petition Date. The rule proposed by Debtors is intriguing in its simplicity, but the Court believes such deference to the numbers and designations found on a debtor's schedules is unwarranted. While agreeing that a faithful reading of section 109(e) calls for a snapshot of indebtedness at the time a debtor files his petition, the Court will cannot go so far as to find that the image captured on the debtor's schedules is always in perfect focus.[13]

■ Recognizing that a debtor's schedules are a potentially imperfect measure of the debtor's debts, the Court concludes a more appropriate approach is to use the debtor's schedules as a starting point in the section 109(e) inquiry, but also to consider postpetition events and developments to the extent (and only to the extent) they shed light on the amount of secured and unsecured debt actually owed by the debtor *at the time of the filing of the petition.*[14] For example, in a situation such as Debtors', where a secured debt is mistakenly scheduled as an unsecured obligation, it would exalt form over substance to refuse to consider a postpetition amendment to the schedules that properly classifies the indebtedness. Similarly, if it were to become evident postpetition that the conditions giving rise to a contingent liability all occurred prepetition, common sense requires recognition of the reality that the debtor was liable for the debt on the petition date.

■ On the other hand, the postpetition occurrence of a condition precedent to the debtor's liability on a debt should not be considered for purposes of determining chapter 13 eligibility. The very fact that there was still a condition to be fulfilled after the petition date confirms that the debt in question was not noncontingent when the debtor entered chapter 13, and, thus, should not be considered in the section 109(e) eligibility analysis.

■ There must be an exercise of discretion in putting this rule into practice to avoid working an injustice on parties who, in good faith, have relied on the debtor's eligibility for chapter 13. If the postpetition event or development shedding light on the debtor's petition date debt position occurs on the eve of the debtor's plan confirmation, it may be inappropriate for the Court to dismiss the debtor's case for exceeding the section 109(e) debt limitations.[15] Dismissal of the case for some other reason (e.g. want of good faith) may be proper if the later-discovered information was available and intentionally omit-

*also In re Camp,* 170 B.R. 610, 611 (Bankr. N.D.Ohio 1994); *In re Toronto,* 165 B.R. 746, 752 (Bankr.D.Conn.1994); *In re Mason,* 133 B.R. 877, 878 (Bankr.N.D.Ohio 1991).

13. Indeed, given Debtors' initial (presumably good faith) scheduling of $287,359.36 in noncontingent, liquidated unsecured debt, adherence to Debtors' theory would mandate dismissal of Debtors' cases.

14. *Accord In re Spiser,* 232 B.R. 669, 672 (Bankr.W.D.Tex.1999) ([court] must look to facts that existed on the date the Chapter 13 case was filed in order to determine the Debtor's eligibility for that chapter); *In re Pulliam,* 90 B.R. 241, 243 (Bankr.N.D.Tex.1988) (debt limitation must be satisfied only on the date the petition is filed); *In re Kutner,* 3 B.R. 422, 424 (Bankr.N.D.Tex.1980) (clear language of [section 109(e)] ... would seem to mandate that the classification be made as conditions exist on the date of filing).

15. *Accord In re Visser,* 232 B.R. 362, 364 (Bankr.N.D.Tex.1999) (if it is determined within a *reasonable* time that the debts exceed the statutory maximums, the case must be dismissed) (emphasis added).

ted by the debtor in preparation of his chapter 13 schedules.[16]

■ The Court's interpretation gives the obvious meaning to words of section 109(e). If a debt is owed on the date of the filing of the petition and is liquidated and not contingent, it must be counted in analyzing a debtor's eligibility for chapter 13. Had Congress intended that eligibility turn on scheduled debt rather than actual debt, it would have said so.[17] Indeed, Congress's failure to exclude disputed debt from the eligibility determination[18] suggests a specific intention to look to the actual amount owed as of the filing. Moreover, Congress made specific provision in section 1305 for claims arising after the chapter 13 petition, without providing that those claims would affect eligibility.[19] In sum, the proper reading of section 109(e) clearly requires consideration only of noncontingent, liquidated debts that are facially enforceable against (i.e. owed by) the debtor on the date of the filing of the petition.

The Court considers this rule to be neither novel nor in conflict with controlling precedent. It is consistent with the Fifth Circuit's reasoning in *In re Nikoloutsos*.[20] In *Nikoloutsos*, the debtor filed a chapter 7 case three days *after* becoming subject to a $600,000 judgment for actual damages in a personal injury action brought by his wife.[21] The state court later amended the judgment to $863,440 to include exemplary damages and prejudgment interest.[22] Upon realizing that his chapter 7 case would not result in a discharge of the personal injury judgment against him, Nikoloutsos converted his case to chapter 13.[23] In his chapter 13 case, Nikoloutsos scheduled his wife as a creditor, but showed the amount owed as $0.00.[24] After the conversion of her husband's case to chapter 13, Mrs. Nikoloutsos filed a complaint to determine the dischargeability of the $863,440 judgment. Ultimately, resolution of the complaint in favor of Mrs. Nikoloutsos turned on Nikoloutsos' eligibility for relief under chapter 13.

Assuming, as section 348(a) provides[25], that the date on which Mr. *Nikoloutsos* filed his chapter 7 case was the petition date for purposes of the section 109(e) eligibility inquiry, Nikoloutsos had *at least* $600,000 in unsecured debt (the personal injury judgment in favor of his wife) on the

---

**16.** In such a situation, the Court might consider facts such as potential prejudice to the parties, best interest of the creditors, the reasons for the misstatement of indebtedness and whether permitting the chapter 13 case to continue would countenance an abuse of the system. This inquiry could include the likely effect on creditors of a dismissal or conversion of the case, both of which often work to the detriment of creditors by adding costs or delays.

**17.** *Compare* 11 U.S.C. § 523(a)(3) (any debt neither listed nor scheduled) and 11 U.S.C. § 1111(a) ([a] proof of claim or interest is deemed filed under section 501 of [the Bankruptcy Code] for any claim or interest that appears in the schedules ...). Further, to rely on a debtor's schedules instead of reality would invite manipulation.

**18.** *Compare, e.g.* 11 U.S.C. §§ 303(b)(1) (subject of a bona fide dispute), 303(h)(1) (unless such debts are the subject of a bona fide dispute), and 1111(a) (except a claim or interest that is scheduled as disputed, contingent, or unliquidated.).

**19.** *See* 11 U.S.C. § 1305.

**20.** 199 F.3d 233 (5th Cir.2000).

**21.** *See Id.* at 234–35.

**22.** *See Id.* at 235.

**23.** *See Id.*

**24.** *See Id.* at 237.

**25.** *See In re Bush,* 120 B.R. 403, 405–06 (Bankr.E.D.Tex.1990).

date of the filing of the petition. Nikoloutsos' failure to include the $600,000 judgment in his schedules did nothing to change the reality that he was indebted in that amount on the petition date. Applying the rule adopted herein, the omission, though discovered postpetition, would be properly considered in determining whether the debtor met the 109(e) eligibility requirements on the date of the filing of the petition. If, as in *Nikoloutsos*, the matter was not discovered until very late in the case, practical considerations might militate in favor of not reopening the section 109(e) inquiry. If, however (and as the Fifth Circuit discussed in *Nikoloutsos*[26]), the omission amounted to a materially false representation or reckless disregard for the truth, dismissal for want of good faith would still be an appropriate remedy.[27]

■ In the case at bar, Debtors' obligations to the Bank under the Guaranties arose, if at all, only upon the Bank's exercise of its option to require Cherco to repurchase accounts receivable. Debtors scheduled their debt to the Bank as a contingent obligation in the amount of $0.00. Since the Court has no contrary evidence showing that the Bank exercised its put prior to the Petition Date, not all of the conditions precedent to Debtors' obligations under the Guaranties were satisfied prepetition. The inescapable conclusion is that the debt to the Bank was contingent on the Petition Date. The Court, therefore, holds that the postpetition settlement of the Bank's claim against Debtors is not relevant in determining the amount of Debtors' unsecured debt on the Petition Date.

■ Finally, the Court considers whether Debtors' amendment of their schedules should be considered in determining their chapter 13 eligibility. The Court holds that Debtors' amendment of their originally filed schedules is a matter properly considered in determining their eligibility for chapter 13. Through mistake, inadvertence or a scrivener's error, the $70,000 secured debt owed to GALI was recorded as an unsecured obligation on Debtors' initial schedules. Debtors' act of merely writing unsecured next to the entry for GALI did not change the reality that the debt was, in fact, secured on the Petition Date. Amendment of the schedules to show the debt as secured simply clarified Debtors' true debt position as of the Petition Date. Further, Debtors amended their schedules twelve days after the Petition Date. No party in interest would have changed its position so drastically in those twelve days as to render consideration of the amendment inequitable. Accordingly, the Court will recognize the postpetition amendment of Debtors' schedules for purposes of determining Debtors' eligibility for chapter 13.

## IV. Conclusion

The Court concludes that any dispute over Debtors' liability on the Guaranties should not be considered in the section 109(e) analysis. Similarly, the postpetition agreement between Debtors and the Bank to fix the Bank's claim at $130,000 does not affect Debtors' eligibility to use chapter 13, since their debt to the Bank was contingent on the Petition Date. On the other hand, Debtors' March 12, 2001 amendment of their schedules is a postpetition event properly considered in determining whether Debtors met the section 109(e) debt

26. *See Id.* at 238.

27. The Fifth Circuit discussed the debtor's lack of good faith in scheduling no amount owed to his wife, but deemed that to be but one factor in determining the equities of the case.

limitations on the Petition Date. In light of the above, the Court finds it proper for Debtors to proceed in their chapter 13 case.