**In re Thomas William SIMMONS and Cathy Ann Simmons, Debtors.**

**In re Darra Lovell Goodwin, Debtor.**

**In re George O. Shockey and Barbara D. Shockey, Debtors.**

**In re Stuart E. Bruchey, Jr. and Tonya L. Crnkovic, Debtors.**

Nos. 01–48565, 01–49091, 02–40232, 01–48316.

United States Bankruptcy Court, N.D. Texas, Fort Worth Division.

Feb. 4, 2003.

Mary A. Daffin, Barrett, Burke, Wilson, Castle, et al., Houston, TX, for Wells Fargo Home Mortgage, Inc.

Barbara K. Hamilton, Becket & Lee, Carol Stream, IL, for Max Recovery Trust I and MBNA America Bank, N.A., Becket & Lee, Malvern, PA, for eCast Settlement Corporation, Assignee.

Mark Stromberg, Stromberg & Associates, Dallas, TX, for Max Recovery Trust I.

Behrooz P. Vida, Venable & Vida, Bedford, TX, for Thomas William Simmons and Cathy Ann Simmons, Stuart E. Bruchey, Jr. and Tonya L. Crnkovic.

Pamela Arnold Bassel, Law, Snakard & Gambill, Ft. Worth, TX, for Ford Motor Credit Company.

James M. Morrison, Ft. Worth, TX, for Darra Lovell Goodwin.

John Adam Seib, Jr., The Seib Law Firm, Dallas, TX, for Al/Tex Homes, Inc.

Dale Weyand, Burns, O'Gorman, Black & Weyand, San Antonio, TX, for Bombardier Capital, Inc.

Stephen A. Goodwin, Carrington, Coleman, Sloman & Blumenthal, Dallas, TX, for ConAgra Trading & Processing.

John Clay Roark, Dunn & Roark, Arlington, TX, for George O. Shockey and Barbara D. Shockey.

TranSouth Financial Corp., Minneapolis, MN, Pro Se.

Raymond E. Kenny, Becket & Lee, Carol Stream, IL, for MBNA America.

Deborah B. Morton, Law, Snakard & Gambill, Ft. Worth, TX, for Chrysler Financial Company, L.L.C.

Tim Truman, Fort Worth, TX, trustee.

### *MEMORANDUM OPINION*

DENNIS MICHAEL LYNN, Bankruptcy Judge.

Before the court are the proposed chapter 13 plans (each a "Plan", and, together, the "Plans") filed by George and Barbara Shockey (the "Shockeys"), Thomas and Cathy Simmons (the "Simmonses"), Stuart E. Bruchey, Jr., and Tonya L. Crnkovic ("Bruchey/Crnkovic") and Darra Goodwin ("Goodwin" and, together with the Shockeys, the Simmonses, and Bruchey/Crnkovic, the "Debtors"). The standing chapter 13 trustee (the "Trustee") filed an objection to each of the Debtors' proposed plans (except that of Bruchey/Crnkovic). The court, having reviewed each of the Plans and the Trustee's objections, instructed Debtors (other than Bruchey/Crnkovic) to appear on October 24, 2002 for confirmation hearings on the Plans. With the exception of the Bruchey/Crnkovic Plan, the court at that time conditionally confirmed the Plans. Bruchey/Crnkovic's Plan was not considered at that time, and an amended plan was filed, which was set for hearing on January 16, 2003. At that hearing the Trustee submitted the Bruchey/Crnkovic Plan as satisfying the requirements for confirmation.[1]

---

1. In accordance with standard practice, the Trustee held a pre-confirmation hearing and submitted the Bruchey/Crnkovic Plan together with a work sheet reflecting, *inter alia,* that the Plan met the requirements for confirmation. The court reviews each plan submitted

Of concern to the court is the manner in which each of the Plans proposes to treat student loan obligations of the Debtors. The issue before the court is whether the Bankruptcy Code[2] (the "Code") prohibits chapter 13 debtors from separately classifying and preferentially treating nondischargeable student loan obligations. Numerous courts have addressed this question, but no consensus has resulted from those decisions.[3] The court considers confirmability of the Plans pursuant to its core jurisdiction under 28 U.S.C. §§ 1334(a) and 157(b)(2)(L). This memorandum opinion constitutes the court's findings of fact and conclusions of law. FED. R. BANKR.P. 7052 and 9014.

## I. *Facts*

As set forth more fully below, each Plan proposes to distinguish among general unsecured obligations in terms of classification and treatment—each Plan establishes one class for student loans and one for all other general unsecured obligations. In each Plan, the return on claims in the former class exceeds the latter. The other terms of the Plans are different.

## A. The Simmons Plan

In their Plan, the Simmonses have proposed to pay their creditors $47,100 over a period of 60 months. Based on information collected at the Simmonses' first meeting of creditors, the Trustee has determined the Simmonses have $1,758 per month of disposable income available for payments under their Plan. The sum of $1,656.29 will be paid to the Simmonses' student loan creditor (in full satisfaction of that claim)[4] and $1,989.74 will be paid to Simmonses' other general unsecured claimants (against claims of $24,871.76). As a result, the student loan claimant will receive a 100% dividend, while all other general unsecured claimants will receive an 8% dividend on their claims. If, on the other hand, the student loan claim were paid on par with the other general unsecured claims, over the term of the Simmons Plan (with no change in the total amount of payments) all general unsecured claimants would receive a 14.5% dividend.

## B. The Shockey Plan

In their Plan, the Shockeys have proposed to pay their creditors $25,250 over a

together with the Trustee's accompanying worksheet. If satisfied that the plan should be confirmed without evidence beyond the Trustee's representations, the court enters an order confirming the plan. Otherwise, the plan is usually set for a further hearing. The Bruchey/Crnkovic Plan, however, appears to the court to be unconfirmable as a matter of law. As the issue presented has been thoroughly briefed to the court, including by counsel for Bruchey/Crnkovic, the court did not deem further proceedings necessary.

2. 11 U.S.C. §§ 101 et seq. Hereinafter, unless otherwise indicated, references to a "section" shall refer to the corresponding provision of the Code.

3. *See e.g. In re Labib–Kiyarash,* 271 B.R. 189 (9th Cir. BAP 2001); *McDonald v. Sperna (In re Sperna),* 173 B.R. 654, 657 (9th Cir. BAP

1994); *In re Thibodeau,* 248 B.R. 699, 703 (Bankr.D.Mass.2000); *In re Colley,* 260 B.R. 532, 535–38 (Bankr.M.D.Fla.2000); *In re Coonce,* 213 B.R. 344, 346 (Bankr.S.D.Ill. 1997); *In re Cox,* 186 B.R. 744, 746 (Bankr. N.D.Fla.1995); *In re Willis,* 189 B.R. 203 (Bankr.N.D.Okl.1995); *In re Benner,* 156 B.R. 631, 634 (Bankr.D.Minn.1993); *McCullough v. Brown (In re Brown),* 162 B.R. 506, 509–15 (N.D.Ill.1993); *In re Brown,* 152 B.R. 232, 235–37 (Bankr.N.D.Ill.1993) *rev'd on appeal,* 162 B.R. 506; and *In re Colfer,* 159 B.R. 602, 607–08 nn. 18 and 19 (Bankr.D.Me.1993); *In re Scheiber,* 129 B.R. 604 (Bankr.D.Minn. 1991); *In re Storberg,* 94 B.R. 144 (Bankr. D.Minn.1988).

4. Under the Simmons Plan, the student loan creditor is to receive no payments for the first 46 months of the 60 month plan, and then would be paid in full in months 47–49.

period of 60 months. Based on information collected at the Shockeys' first meeting of creditors, the Trustee has determined the Shockeys have $540 per month of disposable income available for payments under their Plan. The Shockeys' Plan provides for full payment (plus interest) to the Shockeys' student loan creditor over the course of their Plan,[5] but will pay nothing to other general unsecured claimants (against claims of $13,342.74). As a result of the foregoing, the student loan claimant will receive a 100% dividend during the term of the Shockey Plan, while other general unsecured claimants will receive a 0% dividend on their claims. If, on the other hand, the student loan claim were paid on par with the other general unsecured claims, it would result in a 36% dividend to all unsecured claimants.

## C. The Bruchey/Crnkovic Plan

In their Plan, Bruchey/Crnkovic have proposed to pay their creditors $7,200 over a period of 36 months. Based on information collected at the first meeting of creditors for Bruchey/Crnkovic, the Trustee has determined they have $200 per month of disposable income available for payments under their Plan. The student loan claim is not addressed in the Plan. However, Bruchey/Crnkovic have included a student loan payment of $138.00 per month (or $4,968 over the Plan's 36 month term) in their personal expenses attachment to their Schedule J. Since Bruchey/Crnkovic's unsecured debt (including the student loan

of $7,577.84) totals $84,495.18, the unsecured creditors would receive an 11.7% dividend over the 36 month term of the Plan if the student loan payment were included in disposable income. As the Plan stands, the creditor holding the student loan will receive 65.5% of its debt over the 36 months while other unsecured creditors will receive a 6.35% return.

## D. The Goodwin Plan

In her Plan, Goodwin has proposed to pay her creditors $49,644 over a period of 60 months. Based on information collected at Goodwin's first meeting of creditors, the Trustee has determined Goodwin has $200 per month of disposable income available for payments under her Plan.[6] The Goodwin Plan provides for full payment (plus interest) to Goodwin's student loan creditor over the course of her Plan,[7] but provides for no payments to other general unsecured claimants (against claims of $21,861.92). As a result, the student loan claimant will receive a 100% dividend during the term of the Goodwin Plan, while all other unsecured claimants will receive a 0% dividend on their claims. If, on the other hand, the student loan claim was classified and paid on par with the other general unsecured claims, it would result in a 16.3% dividend to all such claimants.

## II. Discussion

The Debtors have sought the protection of chapter 13 of the Code, which provides an individual meeting certain eligibility requirements[8] with the opportunity to for-

5. Under the Shockey Plan, the student loan creditor would receive no payments for the first 18 months of the 60 month plan, and then would be paid pro rata in months 19–51.

6. The amount paid through a debtor's plan may include amounts other than just disposable income (e.g. regular mortgage payments, car payments, etc.). As a result, the total amount paid through the plan may exceed the

debtor's disposable income multiplied by the plan's term (in months).

7. Under the Goodwin Plan, the student loan creditor would receive no payments for the first 40 months of the 60 month plan, and then would be paid pro rata in months 41–48.

8. See 11 U.S.C. § 109(e). See also In re Hatzenbuehler, 282 B.R. 828 (Bankr.N.D.Tex. 2002).

mulate a plan that will comprehensively deal with secured and unsecured debts. All of the Debtors have incurred student loan obligations, which, pursuant to section 523(a)(8), are not dischargeable through a chapter 13 case.[9]

While separate classification of other unsecured claims from student loans is not, in itself, worrisome, the court is troubled that each Plan proposes preferential treatment for the student loan creditors relative to other nonpriority unsecured creditors. The terms of a debtor's plan are limited only by the facts of the case, the Code, the Federal Rules of Bankruptcy Procedure [10] and counsel's imagination. Here, by proposing plans that provide greater distributions on nondischargeable student loan debts than on other unsecured obligations, Debtors are testing the limits of what the Code and Rules allow.

It is now this court's task to determine if the Plans are in fact outside those limits. As with all inquiries into the proper interpretation of the Code, the first step is to examine the language of the statute itself.

■ Section 1322(b), which describes what a plan may include, states in part: "(b) Subject to subsections [1322](a) and (c) [sic] ..., the plan may ... (1) desig-

nate a class or classes of unsecured claims, as provided in [section 1122], but may not discriminate unfairly against classes so designated; however, such plan may treat claims for a consumer debt ... if an individual is liable on such consumer debt with the debtor differently than other unsecured claims...." Section 1122(a) provides that "[e]xcept as provided in [section 1122(b)], a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." [11]

■ In sum, section 1322(b) authorizes a chapter 13 debtor, in formulating a plan, to designate classes of unsecured creditors subject to two conditions.[12] First, the classification must be as provided in section 1122. Second, the classification must not effect unfair discrimination among the classes.

The Court of Appeals for the Fifth Circuit has added a requirement in chapter 11 cases that prohibits separate classification of similar creditors if the purpose of the separate classes is to create an accepting class for purposes of section 1129(a)(10) of the Code.[13] As unsecured creditors do not

9. Section 1328 of the Code (unlike the discharge provisions for individuals under any other chapter; see sections 727(a), 1141(d) and 1228(a) of the Code) provides a "super discharge". See *In re Thompson*, 224 B.R. 360 (Bankr.N.D.Tex.1998). There are, however, three exceptions to a chapter 13 discharge: "the court shall grant the debtor a discharge of all debts provided for by the plan ... except any debt ... (2) of the kind specified in paragraph (5), (8) or (9) of section 523(a)...." Section 1328(a)(2).

10. *See* FED. R. BANKR.P. 1001 et seq. Hereinafter, references to a "Rule" shall refer to the corresponding Federal Rule of Bankruptcy Procedure.

11. Section 1122(a) prohibits like classification of dissimilar claims, but does not mandate like classification of similar claims.

12. *In re McKown*, 227 B.R. 487, 491 (Bankr. N.D.Ohio 1998). Though in the Bruchey/Crnkovic Plan the student loan debt is not classified, the failure to classify it amounts to separate classification. Singling out a claim for special treatment (as here) may amount unfair discrimination. *In re Tucson Self–Storage, Inc.*, 166 B.R. 892, 898 (9th Cir. BAP 1994).

13. *Phoenix Mutual Life Ins. Co. v. Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir.1991).

vote in chapter 13 cases, this issue does not exist in the cases at bar. On the other hand, unlike chapter 11 in which the unfair discrimination test applies only to dissenting classes (section 1129(b)(1) of the Code), in a chapter 13 plan any classification scheme is subject to the unfair discrimination requirement (sections 1325(a)(1) and 1322(b)(1); *cf.* sections 1225(a)(1) and 1222(b)(1)).

■ Even if a chapter 13 plan were required to place similar claims in the same class, in the court's opinion the non-dischargeable nature of Debtors' student loan obligations versus the dischargeability of Debtors' other unsecured obligations makes the two groups sufficiently dissimilar to justify separate classification pursuant to section 1122. . Thus, each of the Plans satisfies the first prong of the section 1322(b)(1) test.

The court must next scrutinize the Plans to determine if the disparate proposed treatments of the two groups (student loan claims on the one hand and all other nonpriority unsecured debts on the other) runs afoul of section 1322(b)(1)'s prohibition against unfair discrimination. Finally, if section 1322(b)(1) prevents a debtor from separately classifying and preferentially treating nondischargeable student loan obligations, the court must still examine

whether a plan so drafted must be confirmed absent the filing of an objection by a creditor or the Trustee.

Accordingly, the issues before the court are:

1. Does section 1322(b)(1) prohibit a chapter 13 debtor from treating nondischargeable unsecured student loan obligations more favorably than dischargeable general unsecured debt?

2. If section 1322(b)(1) does prohibit such separate classification and preferential treatment, should a plan containing such terms nevertheless be confirmed absent an objection?

## A. The Origins of the Prohibition Against "Unfair Discrimination"

The parameters of the prohibition against "unfair discrimination" are not defined in the Code. To ascertain the scope of the limitation it imposes, therefore, this court must examine the origins and past judicial interpretations of the term "unfair discrimination." [14] From the court's research, it appears that "unfair discrimination" first appeared in the bankruptcy laws through Congress' 1933 expansion of the Bankruptcy Act of 1898 (the "Act"), more than 130 years after the first bankruptcy law was enacted in this country.[15] Prior to

14. For useful discussions of the origins and effects of the unfair discrimination concept, *see* Stephen L. Sepinuk, *Rethinking Unfair Discrimination in Chapter 13*, 74 Am. Bankr. L.J. 341 (2000) and Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr.L.J. 227 (1998).

15. The first bankruptcy law was approved on April 4, 1800 and repealed on December 19, 1803. A second bankruptcy act was approved on August 19, 1841 and repealed on March 3, 1843. The third bankruptcy statute was approved on March 2, 1867 and repealed on June 7, 1878. (which repeal was effective on September 1, 1878). The 1898 Act, which was approved on July 1, 1898, remained in

existence until replaced by the Code. However, until the Great Depression, rehabilitation under the Bankruptcy Act was much more limited. *See* former sections 12 and 13 of the Act. Under the Act as initially passed, voluntary cases could be commenced only by individuals and partnerships (§§ 1a(19) and 4a). Thus section 12 was mostly used (if at all) by individuals. Section 12 of the Act contained no requirement that a "composition" not discriminate unfairly. Section 12d of the Act. In 1933 section 74 of the Bankruptcy Act was passed to provide the consumer debtor with an alternative to the unwieldy procedures of section 12.

1933, the Act did not include a remedy for financially distressed railroads.[16] When Congress added section 77 to the Act providing for railroad reorganizations, it inserted the requirement that a plan not discriminate unfairly. In so doing, Congress provided that the presiding judge would confirm a proposed plan if satisfied that, among other things, the plan was "equitable and [did] not discriminate unfairly in favor of any class of creditors or stockholders...."[17] The prohibition against unfair discrimination was soon thereafter included in new provisions of the Act dealing with reorganizations of corporations[18] and (in two successive statutes) municipalities.[19]

With respect to the prohibition against unfair discrimination in section 77B (the then-effective corporate reorganization section of the Act), the Supreme Court in *Case v. Los Angeles Lumber Products Co.*[20] opined it was part of a legislative adoption of the Court's 1899 holding in *Louisville Trust Co. v. Louisville Ry.*[21] In *Louisville Trust Co.*, a case more commonly noted as a progenitor of the companion absolute priority rule, the Court was faced with apparent collusion between the debtor and one unsecured creditor to the probable benefit of the latter and the detriment of other, similarly situated unsecured creditors. The Court held that "any arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights of [secured or unsecured] creditors comes within judicial denunciation."[22] Though the Court used neither the words "fair and equitable" nor the term "unfair discrimination," the facts of *Louisville Trust Co.* and language in the opinion such as that above and other reference to fairness and equity provided the genesis of these two terms of art.

In 1938, the Chandler Act[23] replaced sections 77B and 74 (pertaining to wage earners) with four new chapters; Chapter

---

16. Initially under the Act, corporations could not become voluntary bankrupts. Act of July 1, 1898, ch. 541, 30 Stat. 544, 547 (1898) ("Any person who owes debts, except a corporation, shall be entitled to the benefits of this Act...."). This was generally construed to make the Act unavailable to railroads as well. To remove any doubt with respect to railroads, the 1910 amendment to the Act revised Section 4 to read "[a]ny person, except a municipal, railroad, insurance, or banking corporation, shall be entitled to the benefits of this Act...." Act of June 25, 1910, Pub.L. No. 61–294, 36 Stat. 838, 839 (1910).

17. Act of March 3, 1933, ch. 204, § 77(g), 47 Stat. 1467, 1479 (1933).

18. Act of June 7, 1934, ch. 424, § 77B(f), 48 Stat. 911, 919 (1934) (providing for confirmation of a plan if the presiding judge was satisfied that, among other things, the plan was "fair and equitable and [did] not discriminate unfairly in favor of any class of creditors or stockholders, and [was] feasible....").

19. *See* Act of May 24, 1934, ch. 345, § 80(e), 48 Stat. 798, 801 (1934) (providing for confirmation of a plan if the presiding judge was satisfied that, among other things, the plan was "fair, equitable and for the best interests of the creditors, and [did] not discriminate unfairly in favor of any class of creditors ...."), *replaced by*, Act of August 16, 1937, ch. 657, § 83(e), 50 Stat. 654, 658 (1937) (providing for confirmation of a plan if the presiding judge was satisfied that, among other things, the plan was "fair, equitable, and for the best interests of the creditors and [did] not discriminate unfairly in favor of any creditor or class of creditors....").

20. 308 U.S. 106, 116, 60 S.Ct. 1, 7, 84 L.Ed. 110 (1939).

21. 174 U.S. 674, 19 S.Ct. 827, 43 L.Ed. 1130 (1899).

22. 174 U.S. at 684, 19 S.Ct. at 830.

23. Act of June 22, 1938, ch. 575, § 1, et seq., 52 Stat. 840.

X (providing for general corporate reorganizations), Chapter XI (providing for the restructuring of unsecured debt of an individual or business entity), Chapter XII (providing for the restructuring of debt of certain real estate partnerships), and Chapter XIII (providing for wage earner debt adjustments). None of Chapters X, XI, XII or XIII contained a prohibition against unfair discrimination.[24]

Finally, the unfair discrimination concept reemerged as a standard provision in rehabilitative chapters when Congress, in enacting the Code to replace the Act,[25] included the concept in the plan confirmation standards of chapter 11 (section 1129(b)(1))[26] and the plan content provisions of chapter 13 (section 1322(b)(1)) (see also section 1222(b)(1) in chapter 12, the chapter dealing with the adjustment of debt for a family farmer added to the Code in 1986).

With respect to chapter 13, there is scant legislative history describing Congress' intended meaning of unfair discrimination.[27] To be sure, the concept arose as a result of plans that treated one group of claimants more favorably at the expense of another group of claimants. As one commentator has described it:

> [The] unfair discrimination [language] began as a device to ensure equal treatment for all creditors and shareholders. This made sense: creditors held debt instruments which were identical; equity holders held undivided interests that were indistinguishable except for the amount held. Thus, the rule arose that reorganization plans ... were only fair if they offered [like] participation to all similarly situated creditors and shareholders.... [Further], regardless of the effect on other classes of creditors and stakeholders, reorganizations had to be fair within each class created.[28]

24. The Act sections dealing with reorganizations of railroads and municipalities were not affected by the Chandler Act and, as a result, retained their respective prohibitions of unfair discrimination. Despite the many years during which the unfair discrimination test was a part of the Bankruptcy Act, unlike the term "fair and equitable," the courts did not develop a judicial gloss defining the test's meaning and theoretical application. Rather a review of Act era cases shows the discrimination standard applied to facts on a case by case basis. *See, e.g., In re Penn Central Transp. Co.*, 596 F.2d 1127, 1152–53 (3d Cir. 1979) (disparate treatment of line lessors did not amount to unfair discrimination where necessary to avoid significant impact on capital structure of post-bankruptcy debtor); *In re Missouri Pac. R. Co.*, 93 F.Supp. 832, 847 (E.D.Mo.1950) (allocation of securities in amount greater than senior creditor's claim did not amount to "unfair discrimination" to junior creditors where premium necessary to compensate senior creditor for inferior nature of securities). The court notes that none of the pre-Code cases it found treating the concept of unfair discrimination require a reading contrary to that adopted by the court herein.

25. The Commission Bill, which served as the antecedent for many provisions of the Code, retained the unfair discrimination test for municipal reorganizations (§ 8–307(c)(1)), while not including it for business reorganizations (§ 7–307(7)) or wage earner cases (§§ 6–204(b) and 6–201(1)). The unfair discrimination test was eliminated for railroad reorganizations in the Commission Bill (§ 9–503(d)). *See* REPORT OF THE COMMISSION ON THE BANKRUPTCY LAWS OF THE UNITED STATES, H.R. Doc. No. 93–137, 93d Cong., 1st Sess. (1973). The Commission Report itself does not discuss "unfair discrimination."

26. The unfair discrimination test of section 1129(b)(1) is also incorporated in chapter 9 by section 901 of the Code.

27. *Accord In re Gonzales*, 172 B.R. 320, 326 (E.D.Wash.1994); *In re Smalberger*, 157 B.R. 472, 475 (Bankr.D.Or.1993).

28. Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr.L.J. 227, 230–31 (1998).

While the origins of the unfair discrimination standard appear to be from entity (as opposed to individual) insolvency cases, Congress saw fit, nevertheless, to import the standard into chapter 13. Apparently, the standard was included to provide "clarity" in the Code.[29]

### B. *Meaning of Unfair Discrimination*

Notwithstanding the presumable clarity of what "unfair discrimination" means, at least in the context of these student loan cases, the court finds it necessary to probe more deeply into the term's meaning. A good starting point for this inquiry is to examine what legislative history there is explaining the term "unfair discrimination." The only meaningful discussion of unfair discrimination as used in the Code that the court has found is in the legislative history pertaining to the standards for confirming a chapter 11 plan under section 1129(b)(1).[30] The unfair discrimination provision was part of an amendment to the Code passed by the House of Representatives, and its reason was explained:

> The plan may be confirmed over [a class's dissent] if the class is not unfairly discriminated against with respect to equal classes.... One aspect of this test that is not obvious is that whether one

class is senior, equal or junior ... is relative.... [F]rom the perspective trade creditors ... claims of senior and subordinated debentures may be [both] entitled to share [with trade claims] on an equal basis....

The criterion of unfair discrimination is not derived from the fair and equitable rule or from the best interests of creditors test. Rather it preserves just treatment of a dissenting class from the class's own perspective.[31]

■■ Two points may be gleaned from the foregoing.[32] First, unfair discrimination focuses on the class discriminated against. Second, the test is one to be applied among equal classes: just as the term "fair and equitable" establishes in chapter 11 a test of vertical fairness, so "unfair discrimination" provides a horizontal requirement of fairness. It is relatively unlikely that an individual debtor under chapter 13 will have senior and junior unsecured debt, and therefore the supposition would be that a chapter 13 plan would discriminate unfairly by treating one class of unsecured creditors better than another class of unsecured creditors.[33]

■ On the other hand, necessarily inherent in the term "unfair discrimination"

---

29. 124 Cong. Rec. 32,407 & 34,006 (1978) (comments of Rep. Edwards and Sen. DeConcini). *See id.* with respect to chapter 11.

30. Section 1129(b)(1) states:

> (b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted the plan.

31. H.R.Rep. No. 595, 95th Cong. 1st Sess. 416–417 (1977), U.S.Code Cong. & Admin.News 1978, 5963, 6372–6373.

32. There appears to be no reason to assume that Congress intended different meanings for the term "unfair discrimination" in chapters 11 and 13. This conclusion is supported by the use, through incorporation in section 1322(b)(1), of section 1122 of the Code. *See also Liberty Nat. Enterprises v. Ambanc LaMesa Ltd. Partnership,* 115 F.3d 650, 656 (9th Cir.1997).

33. As discussed below, the unfair discrimination test is applicable differently in chapter 13 (and chapter 12) than in chapter 11 (and chapter 9) because unsecured creditors in chapter 13 have no vote.

748

is the notion that there may be "fair" discrimination in the treatment of classes of creditors.[34] For example, Congress has decreed discrimination in favor of certain types of unsecured claims by granting them priority. A class of general unsecured creditors disadvantaged by discrimination in favor of priority claims has no complaint. Moreover, besides the priorities recognized in section 507(a) of the Code, Congress has established special rules for treatment of non-recourse deficiency claims in chapters 9 and 11 (section 1111(b)(1)); certain prepetition trade and tort debt in railroad reorganizations (section 1171); certain retiree benefits in chapter 11 (section 1129(a)(13)); and certain cosigned loans in chapters 12 and 13 (sections 1222(b)(1) and 1322(b)(1)).

A second type of discrimination that will not be "unfair" is disparate treatment of equal classes that provides each with equal return. Thus, payment of 20% of each claim in cash for one class does not result in unfair discrimination against a class of equal priority that is satisfied by providing to each class member a note having a present value of 20% of its claim. Similarly, payment of one class in chapter 13 over different sequential months than another class would comply with section 1322(b)(1) so long as the members of both classes receive the same return.

The next question for the court is whether Congress has evinced a specific intent to permit discrimination by a chapter 13 debtor in his plan in favor of student loan creditors. If not, then the court must inquire whether otherwise disparate treatment (i.e., treatment yielding different returns) between equal classes could ever be "fair".

## C. *Exceptions to the Unfair Discrimination Rule*

■ Congress knows how to make exceptions to a statutory provision of general application. The Bankruptcy Code is rife with examples. See, e.g., sections 109(d), 303(a), 504(a), 1122(a), 1124 and 1328(a). Indeed, this court shares the view of Judge Higginbotham of the Fifth Circuit Court of Appeals that the specific provision in section 1322(b)(1) of the Code regarding treatment of certain cosigned debts (the "however" clause) is an exception to the unfair discrimination requirement.[35]

■ Where Congress has specified exceptions to a provision of general application, that which is not excepted is included.[36] It would appear, then, that Congress did not intend to exempt claims based on student loans from the general classification requirements of section 1322(b)(1)—including the limitation that their treatment may not result in unfair discrimination. The mere fact that debts from student loans are not dischargeable is not sufficient basis for an exception to the plainly stated test of section 1322(b)(1). This conclusion is reinforced by the absence of any exception to the unfair discrimination rule for nondischargeable debts in chapter 12 (where the discharge is no broader than chapter 7; see section 1228(a)). Had Congress intended to allow preferential treatment of nondischargeable claims—of any sort—surely sections 1222(b)(1) and 1322(b)(1) (and, for that matter, for individual chapter 11 cases, section 1129(b)(1)) would have said so. The better reasoning is that no such exception exists.

---

**34.** 7 COLLIER ON BANKRUPTCY ¶ 1129.04[3] (15th ed.2002).

**35.** *In re Chacon v. Bracher,* 202 F.3d 725, 726 (5th Cir.1999).

**36.** *See Toibb v. Radloff,* 501 U.S. 157, 161, 111 S.Ct. 2197, 2199, 115 L.Ed.2d 145 (1991).

Some courts,[37] however, have found the basis for an exception to section 1322(b)(1) for non-dischargeable debts in section 1322(b)(5).[38] The court does not find the argument based on section 1322(b)(5) persuasive. First, section 1322(b)(5) does not address the question of treatment of classes of claims. Second, it would be absurd to permit preferential treatment of a debt solely on the basis that its original term extended beyond the term of the plan. There is no logical rationale for so differentiating and permitting the full payment of some (but not all) long-term debt, even under a plan that provides nothing to creditors on a legal parity with that debt.

The chapter 12 cognate to section 1322 provides an explanation for section 1322(b)(5)'s true purpose. Section 1222(c) states that "*except as provided in subsection[ ](b)(5)* ..., the plan may not provide for payments over a period ... longer than three years unless the court ... approves a longer period ... that is [no] longer than five years." (Section 1222(c); emphasis added). Thus, section 1222(b)(5), which is substantially identical to section 1322(b)(5), was meant to create an exception for long-term debt to the time limit on payments under a plan, not to affect applicability of the unfair discrimination rule.[39] Though chapter 13's version of section 1222(c), section 1322(d),[40] does not refer to section 1322(b)(5), there is no reason to suppose Congress meant the provisions to operate differently.[41] Thus, the court concludes the Code offers no exception that would permit a chapter 13 debtor to discriminate in treatment in favor of a nondischargeable student loan to the detriment of other unsecured creditors.

## D. Standard for Fair Discrimination in Treatment

The court is now confronted with the question of whether a chapter 13 plan may

---

**37.** See e.g. *In re Groves,* 39 F.3d 212, 215 (8th Cir.1994); *In re Labib–Kiyarash,* 271 B.R. 189 (9th Cir. BAP 2001); *In re Williams,* 253 B.R. 220, 227–28 (Bankr.W.D.Tenn.2000); *In re Chandler,* 210 B.R. 898, 903–04 (Bankr. D.N.H.1997); *In re Sullivan,* 195 B.R. 649, 657–59 (Bankr.W.D.Tex.1996); *In re Cox,* 186 B.R. 744, 746–47 (Bankr.N.D.Fla.1995); *In re Anderson,* 173 B.R. 226, 230 & n. 8 (Bankr. D.Colo.1993); *In re Eiland,* 170 B.R. 370, 379–80 (Bankr.N.D.Ill.1994); *In re Benner,* 156 B.R. 631, 634 (Bankr.D.Minn.1993); *In re Christophe,* 151 B.R. 475, 480 (Bankr. N.D.Ill.1993); *In re Dodds,* 140 B.R. 542, 543–44 (Bankr.D.Mont.1992); *In re Saulter,* 133 B.R. 148, 150 (Bankr.W.D.Mo.1991); *In re McKinney,* 118 B.R. 968, 971 (S.D.Ohio 1990); *In re Newberry,* 84 B.R. 681, 684 (Bankr.E.D.Cal.1988); *In re Geehan,* 59 B.R. 600, 603 (Bankr.S.D.Ohio 1986).

**38.** Section 1322(b)(5) states
"(b) Subject to subsection (a) and (c) [sic] of this section, the plan may—....
(5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due...."

**39.** Sections 1222(b)(5) and 1322(b)(5) appear to parallel section 1124, which allows a chapter 11 debtor to cure and reinstate (and so leave unimpaired) a class of claims. Just as section 1124 provides no exception to section 1129(b), the chapter 12 and chapter 13 equivalents do not provide a way around the "unfair discrimination" requirement, which, after all, focuses on the class discriminated against.

**40.** Section 1322(b)'s introductory clause incorrectly refers "subsections (a) and (c)" rather than (a) and (d). Presumably the change necessary to the introductory clause was overlooked when present section 1322(c) was added to the Code in 1994.

**41.** The court similarly concludes that references to unsecured claims in section 1322(b)(4) was not meant to allow preferential treatment of one class of unsecured claims over another.

discriminate in treatment of unsecured creditors other than by different but equal treatments or pursuant to specific authority contained in the Code. Many courts have answered this question in the affirmative. A test applied by many courts fixes four requirements that must be met to justify disparate, unequal treatment of parity classes—i.e. to discriminate fairly:

1. Whether the discrimination has a reasonable basis;

2. Whether the debtor can carry out a plan without so discriminating;

3. Whether the discrimination is proposed in good faith; and

4. Whether the degree of discrimination is directly related to the basis for it.[42]

Other courts have substituted for the fourth prong of this test an examination of the treatment of the class discriminated against.[43] A few courts have added as a fifth prong whether the class discriminated against will receive less by reason of the discrimination than it would have if the

discrimination had not occurred.[44] Other courts have not adopted *Wolff's* four-part test at all.[45]

The second element of the four part test would effectively make it impossible to discriminate in favor of student loan claims, as it is most unlikely that such discrimination would be necessary to the performance of the debtor's plan. The third element appears to the court to duplicate the confirmation requirement of section 1325(a)(3) of the Code. Bad faith discrimination among classes would be a fatal flaw in a plan under any chapter.

The Court of Appeals for the Fifth Circuit has spoken to the meaning of "unfair discrimination" in Chapter 13 twice recently.[46] Both of these cases involved (as have many other chapter 13 unfair discrimination cases) reconciliation of the prohibition on unfair discrimination with section 1322(b)(1)'s "however" clause pertaining to cosigned debt. In *Chacon*, Judge Higginbotham first concluded, contrary to

---

**42.** This test was enunciated in *In re Wolff*, 22 B.R. 510, 512 (9th Cir. BAP 1982) in a chapter 13 case. It has been adopted in chapter 13 cases in *inter alia In re Leser*, 939 F.2d 669, 672 (8th Cir.1991), *In re Gonzales*, 172 B.R. 320, 326 (E.D.Wash.1994); *In re Whitelock*, 122 B.R. 582, 589 (Bankr.D.Utah 1990); *In re Thompson*, 191 B.R. 967, 971 (Bankr. S.D.Ga.1996). *See also In re Ramirez*, 204 F.3d 595, 598 (5th Cir.2000), Benavides, J., concurring. *In Liberty Nat. Enterprises v. Ambanc La Mesa Ltd. Partnership*, 115 F.3d 650, 656 (9th Cir.1997), the court adopted the *Wolff* test for unfair discrimination in a chapter 11 case. *See also In re Buttonwood Partners, Ltd.*, 111 B.R. 57 (Bankr.S.D.N.Y.1990). But *see Matter of 203 N. LaSalle St. Partnership*, 126 F.3d 955, 969 (7th Cir.1997), *rev'd on other grounds, Bank of America National Trust and Savings Assoc. v. 203 N. LaSalle St. Partnership*, 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999), which concluded the chapter 11 debtor's plan did not discriminate unfairly where a non recourse creditor (who would receive nothing in chapter 7) was to be

paid a 16% return on its deficiency, as compared to 100% payment of trade creditors (who would have received the same recovery in chapter 7).

**43.** *See, e.g. In re Riggel*, 142 B.R. 199, 202 (Bankr.S.D.Ohio 1992); *In re Cheak*, 171 B.R. 55, 58 (Bankr.S.D.Ill.1994), *In re Martin*, 189 B.R. 619, 627 (Bankr.E.D.Va.1995). Some courts substitute for fourth test the requirement of a meaningful payment to the class discriminated against. *See, e.g., In re Strausser*, 206 B.R. 58, 60 (Bankr.W.D.N.Y.1997).

**44.** *See In re Applegarth*, 221 B.R. 914, 916 (Bankr.M.D.Fla.1998).

**45.** *See, e.g., In re McKown*, 227 B.R. 487 (Bankr.N.D.Ohio 1998). As discussed below, the Fifth Circuit has not utilized the four part test from *Wolff*.

**46.** *In re Chacon*, 202 F.3d 725 (5th Cir.1999); *In re Ramirez*, 204 F.3d 595 (5th Cir.2000).

some other courts,[47] that the "however" clause created an exception to the unfair discrimination rule. He then went on to state:

> [P]references in treatment are not discriminatory if they rationally further a legitimate interest of the debtor and do not disproportionately benefit the *co-signer*, e.g. by reimbursing interest where none is due or reimbursing more than the actual amount of the cosigned debt.[48]

The court reads this language as meaning that a plan may provide for better treatment—payment in full—of a cosigned debt by virtue of the "however" clause. But the plan may not further benefit the cosignor by overpayment of the debt. This is consistent with the interpretation of the companion "fair and equitable" test of chapter 9 and chapter 11 (the "absolute priority rule"), which requires that a senior class be satisfied in full before any provision for junior classes, but which also prohibits a greater than full return to the senior class to the detriment of the junior class.[49]

■ While *Chacon* and *Ramirez* are directly applicable only in the context of cosigned debt, they offer some guidance regarding classification and unfair discrimination generally. *Chacon* and *Ramirez* appear to establish a two-prong test for fair discrimination in treatment between classes. First, the discrimination must serve a rational, legitimate purpose of the debtor. Second, the discrimination may not over-favor the advantaged class. The court believes this second element, when translated to unfair discrimination in general (as opposed to limiting the preference afforded cosigned debt), should be reversed. *Cf. Applegarth.* The court accordingly concludes that, for discrimination to be fair, the amount to be received by the class discriminated against must not be less than the class would have been entitled to receive had there been no discrimination among classes.[50] The court therefore will apply a two prong test to Debtors' plans, the first being the rational purpose requirement of *Chacon* and the second being the minimum permissible return test derived from Chacon, *Applegarth* and the

---

47. *See, e.g., Nelson v. Easley,* 72 B.R. 948 (Bankr.M.D.Tenn.1987); *In re Cheak,* 171 B.R. 55, 58 (Bankr.S.D.Ill.1994).

48. *In re Chacon,* 202 F.3d at 726; *In re Ramirez,* 204 F.3d at 596 (emphasis added).

49. The "fair and equitable" test and the prohibition on "unfair discrimination" will often have overlapping effect. *Cf. In re Missouri Pac. R. Co.,* 93 F.Supp. 832 (E.D.Mo.1950).

50. *Cf. In re Dow Corning Corp.,* 244 B.R. 705 (Bankr.E.D.Mich.1999). In *Dow,* a chapter 11 case, the court relied on the definition of unfair discrimination proposed by Professor Markell (see footnote 14, *supra*). The court established, for purposes of 1129(b)(1), that a rebuttable presumption of unfair discrimination arises when there is: (1) a dissenting class; (2) another class of the same priority; (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of net present value of all payments); or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution. The court believes the *Chacon* opinion (and the test herein adopted) is consistent in most respects with the presumption adopted by *Dow.* While not prepared, as was the *Dow* court, to couch its formula for fair discrimination in terms of a rebuttable presumption, the court does not intend that its test be applied with rigid, mathematical objectivity. If the facts demonstrate that a failure to discriminate, would directly or indirectly impair the debtor's motive or ability to perform the plan, to the detriment of the class discriminated against, disparate treatment may be justified. *Cf.* the second element of *Wolff's* four part test.

legislative history to section 1129(b)(1) of the Code.[51]

### E. Application in General

■ The court must next decide how to apply the foregoing reasoning to chapter 13 cases involving separate classification of student loans. A debtor who separately classifies and discriminates in favor of a student loan creditor meets the rational purpose element. The second element however is more problematic.

■ Presumably, in a chapter 11 case, unfair discrimination would occur if one class of creditors, as compared with a parity class, received less than its fair share of the going concern value of the debtor (or the value available to those classes under the plan) calculated on the basis that no discrimination occurs. Thus, if discrimination serves to enhance going concern value it may not be unfair so long as the class discriminated against receives at least as much as it would have had there been no discrimination.[52]

The measure of a business's going concern value will be its ability to generate income in excess of expense. If a chapter 13 debtor is in business for himself, this is the same way disposable income will be calculated under section 1325(b)(2): earnings less (1) "expenditures necessary for the continuation, preservation, and operation of [the] business" (section 1325(b)(2)(B)); and (2) necessary expenditures "for the maintenance or support of the debtor or a dependant of the debtor . . . ." (section 1325(b)(2)(A)).[53]

This would suggest that a class would not be unfairly discriminated against in a chapter 13 business case if the class receives its fair share of the debtor's disposable income as defined in section 1325(b)(2). There appears to be no reason why this conclusion should not also apply to the non-business chapter 13 debtor.

However, chapter 13's structure is different than chapter 11's. Chapter 13 plans are limited in term. Except for cured debt paid out as allowed by section 1322(b)(5) of the Code, the debtor may only extend his plan—and so commit his disposable income—for five years. Section 1322(d) of the Code.

Furthermore, the court may authorize a plan term in excess of three years only upon a showing of "cause." Section 1322(d) of the Code. Virtually all the case law the court has found suggests that "cause" is to be determined in terms of benefit to the debtor.[54] This suggests that a class of creditors is not unfairly discriminated against if it receives the same share of only three years (as opposed to the term of the plan) of the debtor's disposable income that it would have received absent the discrimination.

---

**51.** Obviously, any discrimination must also otherwise be consistent with the Code.

**52.** This would seem to be the thrust of a plan that favors the "critical vendor" in exchange for credit or other benefit. See Phoenix Mutual Life Insurance Co. v. Greystone III Joint Venture, 995 F.2d 1274, 1280–81 (5th Cir. 1991); see also Liberty National Enterprises v. Ambanc La Mesa Ltd. Partnership, 115 F.3d 650, 656–57 (9th Cir.1997).

**53.** Just as Congress amended section 1325(b)(2)(A) to permit contributions to chari-

ty in 1998, it could have, but did not, exempt student loan payments from disposable income.

**54.** In re Villanueva, 274 B.R. 836 (9th Cir. BAP 2002); Washington Student Loan Guar. Ass'n v. Porter (In re Porter), 102 B.R. 773 (9th Cir. BAP 1989); In re Pedersen, 229 B.R. 445, 447–449 (Bankr.E.D.Ca.1999); In re Burris, 208 B.R. 171, 177–78 (Bankr.W.D.Mo.1997); In re Greer, 60 B.R. 547, 555 (Bankr.C.D.Cal. 1986).

This conclusion is supported by the difference between section 1325(b)(1) and section 1225(b)(1). The latter provides that, upon objection to a chapter 12 plan, the court "may not approve the plan unless . . . the plan provides that all of the debtor's disposable income . . . in the three year period, *or such longer period as the court may approve* . . . will be applied to making payments under the plan" (emphasis added). Section 1325(b)(1) is identical to this provision except for the exclusion of the italicized words. The court accordingly holds that a plan in chapter 13 does not discriminate unfairly so long as (1) the discrimination has a rational basis; and (2) the class discriminated against receives under the plan a return at least equal to what the class would have received if (a) there were no discrimination, and (b) 36 months of the debtor's disposable income were applied to make payments under the plan.[55]

## F. *Necessity of Objection*

■ Before turning to the application of this holding to the cases at bar, the court must decide whether it may refuse to confirm a plan that does not conform to its holding in the absence of an objection by the Trustee or an unsecured creditor. If an objection is a prerequisite to denial of confirmation based on discrimination, then the Bruchey/Crnkovic Plan must be confirmed regardless of its failure to comply with the requirements set out above.

This inquiry is necessary because section 1325(b) may be invoked only upon the objection of the Trustee or an unsecured creditor.[56] Thus, if the court were requiring in this opinion dedication of three years of a debtor's disposable income to payments under the plan, its holding could not by applied to the Bruchey/Crnkovic Plan. However, the court is *not* requiring of Bruchey/Crnkovic dedication of three years of disposable income to payments under their Plan. Rather, the court has determined that a class is discriminated against unfairly if the class receives less under a plan than it would have received, absent discrimination, if the plan dedicated to payments three years of the debtor's disposable income. A plan which does not discriminate is confirmable (absent objection) even if less than three years of disposable income is dedicated to plan payments.

The court's consideration of confirmability of the Bruchey/Crnkovic plan is pursuant to the unfair discrimination prohibition of section 1322(b)(1), not the disposable income test of section 1325(b). If a plan violates the prohibition on unfair discrimination, the court may deny its confirmation by reason of section 1325(a)(1) of the Code, which requires that a plan comply with other provisions of chapter 13. Though the court is not required in chapter 13 to determine that a plan meets the requirements of section 1325 before it may be confirmed,[57] a plan is not confirmable if it

---

55. Put another way, having calculated three years of the debtor's disposable income, the total of senior debt (secured and priority) to be paid under the plan should be deducted. The balance must be shared pro rata among student loan and other creditors. To the extent of payments to be made under the plan in excess of three years' disposable income, the student loan claim may be preferred.

56. *See* 8 COLLIER ON BANKRUPTCY ¶ 1325.08[2] (15th ed.2002). Though section 105(a) of the Code gives the court broad discretion to raise issues on its own motion, section 1325(b)(1) is quite explicit in requiring an objection by the Trustee or an unsecured creditor.

57. 8 COLLIER ON BANKRUPTCY ¶ 1325.01 (15th ed. rev.2002).

contains a provision prohibited by section 1322.[58]

### III. Application to Debtors' Plans

As stated above, the determination of whether the Plans violate the prohibition against unfair discrimination rests on a comparison between what unsecured creditors (excluding student loan creditors) will receive under the proposed Plans and the amount such creditors would receive from the first 36 months of Debtors' respective disposable incomes if there were no separate classification and treatment of student loan obligations. Before performing these analyses, the court notes that the Trustee has developed a shorthand method of determining the amount section 1325(b)(1) requires a particular debtor to pay into his plan. The Trustee multiplies the debtor's disposable income by thirty-six, and refers to the resulting total as that debtor's "Minimum Base Amount".[59] It is with Debtors' respective Minimum Base Amounts that the court begins its examination of the Plans.

#### A. The Simmons Plan

■ The Trustee determined the Simmonses' disposable income to be $1,758 per month. Accordingly, their Minimum Base Amount is $63,288. As described above, over the term of their Plan, the Simmonses will pay $47,100 to their creditors (se-

cured and unsecured). The Trustee objected to their Plan, so the Simmonses are required by section 1325(b)(1) to make payments under their Plan adding up to at least their Minimum Base Amount. The Simmonses' Plan fails to provide for payment of 36 months of disposable income, so it fails under section 1325(b)(1), and the court need not address whether the proposed classification scheme is unfairly discriminatory to general unsecured creditors.[60] The Simmonses are, however, granted leave to amend their plan to conform with the standards set forth herein.

#### B. The Shockey Plan

■ By the Trustee's calculations, the Shockeys have $540 per month in disposable income. Accordingly, their Minimum Base Amount is $19,440. Because the Trustee has objected to their Plan, section 1325(b)(1) requires the Shockeys to dedicate, at the least, their Minimum Base Amount toward Plan payments. Over the term of their Plan, the Shockeys will pay $25,250 to their creditors (secured and unsecured). Thus, the Shockey Plan satisfies section 1325(b)(1).

The court must next examine how the $19,440 (i.e. the Minimum Base Amount) will be distributed under the Plan, and whether the Shockeys' student loan creditor will receive a disproportionate share of

---

**58.** 8 COLLIER ON BANKRUPTCY ¶ 1325.02[1] (15th ed. rev.2002).

**59.** The importance of this concept comes into play when a plan provides for payment of a debtor's Minimum Base Amount (consisting of 36 months of disposable income) over a period that is longer or shorter than 36 months. In such situations, the debtor obviously pays less or more, respectively, than his "disposable income" in a given month. The Trustee has taken a pragmatic approach with respect to debtors paying out the amount required by section 1325(b)(1) (i.e. the Minimum Base Amount), and, in proper circumstances, allows debtors to con-

dense or elongate the payment period as justified by the circumstances.

**60.** At the October 24, 2002 hearing, this court conditionally confirmed the Simmonses' Plan, and later stated that its holding with respect to unfair discrimination would be applied prospectively. Because the Trustee objected to the Plan, and because section 1325(b)(1) states that, upon such an objection, the court "shall not approve" a plan unless it meets the requirements of section 1325(b)(1)(A) or (B), the court must revoke its conditional confirmation of the Simmonses' Plan.

that amount. First, the Trustee takes 10% of the Minimum Base Amount as a fee for administering the Shockeys' chapter 13 case. The Shockeys' attorney is then paid $1,750 through the Plan. After these first two deductions, there remains $15,746 for payment to creditors. Next, the Shockey Plan provides for payment of $7,305.88 [61] to secured creditors, leaving $8,440.12 of the Shockeys' Minimum Base Amount for payment to unsecured creditors.

The Shockeys' Plan proposes to pay none of the remaining Minimum Base Amount to general unsecured creditors. At the same time, it provides for pro rata payments to their student loan creditor beginning in the nineteenth month of their Plan. That the Shockeys have chosen to pay their student loan creditor in full through their Plan is not improper.[62] That the Shockeys propose to direct to their student loan creditor more than its fair share (when compared to other general unsecured creditors) of the Minimum Base Amount not consumed by priority and secured obligations is improper. Clearly, such treatment violates this court's test for unfair discrimination under section 1322(b)(1).[63]

### C. The Bruchey/Crnkovic Plan

The Trustee calculated Bruchey/Crnkovic's disposable income to be $200 per month. As a result, their minimum Base Amount is currently $7,200. As the Trust-

ee did not object to the Bruchey/Crnkovic Plan, section 1325(b)(1) is not itself implicated as a confirmation standard. Rather, the court must focus on whether the Bruchey/Crnkovic Plan meets the standards set forth above with respect to classification and treatment of unsecured indebtedness, referring to section 1325(b)(1) only for the purpose of determining whether unfair discrimination exists.

In their Plan, Bruchey/Crnkovic have proposed to pay their creditors $7,200 over a period of 36 months. This amount equals what the Trustee determined their Minimum Base Amount to be at the section 341 meeting of creditors. Upon further investigation, however, the court notes that Bruchey/Crnkovic has included a student loan payment of $138.00 per month (or $4,968 over the Plan's 36 month term) in their personal expenses attachment to their Schedule J.[64] This amount is not properly devoted to personal expenses and should be viewed as additional disposable income (and the student loan claim should be classified and paid through the Plan). To allow otherwise would condone *de facto* classification of claims merely by designating and paying them as personal expenses outside of the Plan and correspondingly reducing disposable income.

If the $138.00 is included in disposable income (as this court holds it should be), Bruchey/Crnkovic's disposable income ris-

---

**61.** Consisting of a payment of $2,694.88 (plus $327 in interest) to Bank of America Mortgage in months 12 through 22 and $3,900 (plus $384 in interest) to Transouth Financial Corp. in months 10 through 28.

**62.** Indeed, the Shockeys may, within reason, do anything they wish with disposable income in excess of their Minimum Base Amount.

**63.** At the October 24, 2002 hearing, this court conditionally confirmed the Shockeys' Plan, and later stated that its holding with respect

to unfair discrimination would be applied prospectively. Accordingly, the court will allow its confirmation of the Shockey Plan to stand.

**64.** Bruchey/Crnkovic also included another student loan claim in the amount of $7,156.08 in the class of general unsecured claims to be paid under the Plan. This indicates that Bruchey/Crnkovic understood the proper manner in which to treat student loan claims in chapter 13.

es to $338 per month. This would amount to a Minimum Base Amount of $12,168. The Trustee would take 10% of the Minimum Base Amount as a fee for administering Bruchey/Crnkovic' chapter 13 case, and $1,500 would be paid to Bruchey/Crnkovic's attorney. As the Bruchey/Crnkovic Plan provides for no payment of secured claims, $9,451.20 of the Minimum Base Amount would remain for distribution to unsecured creditors.

■ Since Bruchey/Crnkovic's unsecured debt (including the student loan claim of $7,577.84 currently positioned to be paid directly as a personal expense) totals $84,495.18, if the student loan payment were included in disposable income, unsecured creditors would receive an 11.1% dividend over the 36 month term of the Plan. As the Plan stands, the student loan creditor Bruchey/Crnkovic have proposed to pay directly as a personal expense will receive 65.5% of its debt over the 36 months, while other unsecured creditors (including the other student loan claimant) will receive a 6.35% return.

Such differentiation in treatment is not permissible in that it amounts to separate classification and preferred treatment of the one student loan creditor. In accordance with the court's interpretation of section 1322(b)(1)'s prohibition against unfair discrimination, the $138.00 per month currently dedicated to paying the student loan creditor should be added to the Minimum Base Amount and shared pro rata among all general unsecured creditors. Accordingly, confirmation of this Plan must be denied.[65] Bruchey/Crnkovic may, however, amend their Plan to comport

with this court's ruling, and resubmit it for consideration.

### D. The Goodwin Plan

■ The Trustee calculated Goodwin's disposable income to be $200 per month. Accordingly, her Minimum Base Amount is $7,200. Because the Trustee has objected to her Plan, section 1325(b)(1) requires Goodwin to dedicate, at the least, the Minimum Base Amount toward Plan payments. Over the term of her Plan, Goodwin will pay $49,644 to her creditors (secured and unsecured). Thus, the Goodwin Plan satisfies section 13,25(b)(1).

The court must next examine how the $7,200 (i.e. the Minimum Base Amount) will be distributed under the Plan, and whether Goodwin's student loan creditor will receive a disproportionately large share of that amount. First, the Trustee takes 10% of the Minimum Base Amount as a fee for administering Goodwin's Plan. Next, Goodwin's attorney is paid $1,750 through her plan. After these first two deductions, there is $4,730 of Goodwin's Minimum Base Amount remaining for payment to creditors. Next, Goodwin's Plan provides for payment of $25,056[66] to secured creditors, thereby completely exhausting Goodwin's Minimum Base Amount before any unsecured creditor becomes entitled to a distribution.

Goodwin also proposes to pay $4,257.77 to a student loan creditor over months 41 through 48 of her Plan. Because general unsecured creditors are entitled to no portion of Goodwin's Minimum Base Amount, her Plan does not violate section 1322(b)(1)'s prohibition against unfair dis-

---

**65.** The Bruchey/Crnkovic Plan was not conditionally confirmed and would not benefit from prospective application of this opinion.

**66.** Consisting of payments equaling $10,300 (plus $1,690 in interest) in months 10 through

52 to Ford Motor Credit for a 1997 F–150 truck and $22,150 (plus $2,952 in interest) in months 10 through 53 to Ford Motor Credit for a 2001 Ford Expedition.

crimination by satisfying the student loan creditor from income above and beyond the Minimum Base Amount.

## IV. Conclusion

For the reasons stated above, confirmation must be denied as to the Simmons Plan and the Bruchey/Crnkovic Plan. As the court indicated its ruling would be prospective as to the cases heard on October 24, 2002, the Shockeys' Plan will be confirmed notwithstanding its failure to comply with this opinion. The Goodwin Plan is confirmable under the test set out above.

The Trustee is directed to submit orders in conformity with this opinion.